UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-5130
(1:07-cr-00209-TSE-1)

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

WILLIAM J. JEFFERSON,

> Defendant – Appellant.

O R D E R

The Court amends its opinion filed March 26, 2012, as follows:

On page 43, first line of text -- the name  "John McHugh" is replaced with the name "Matthew F. McHugh"; "the current Secretary of the Army" is deleted; and "Secretary McHugh" is replaced with "Former congressman McHugh."

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

WILLIAM J. JEFFERSON,

*Defendant-Appellant.*

No. 09-5130

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:07-cr-00209-TSE-1)

Argued: December 9, 2011

Decided: March 26, 2012

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Duncan concurred.

**COUNSEL**

**ARGUED:** Lawrence Robbins, ROBBINS, RUSSELL, ENG-LERT, ORSECK, UNTEREINER & SAUBER, LLP, Washington, D.C., for Appellant. Mark D. Lytle, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Robert P. Trout, Amy Berman Jackson, Gloria B. Solomon, TROUT CACHERIS, PLLC, Washington, D.C.; Mark A. Hiller, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER, LLP, Washington, D.C., for Appellant. Neil H. MacBride, United States Attorney, David B. Goodhand, Assistant United States Attorney, Rebeca H. Bellows, Assistant United States Attorney, Charles E. Duross, Special Assistant United States Attorney, Amanda Aikman, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

**OPINION**

KING, Circuit Judge:

In August 2009, former Louisiana congressman William J. Jefferson was convicted in the Eastern District of Virginia of eleven offenses — including conspiracy, wire fraud, bribery, money laundering, and racketeering — arising from his involvement in multiple bribery and fraud schemes. Jefferson has appealed his convictions on several grounds: (1) that an erroneous instruction was given to the jury with respect to the bribery statute's definition of an "official act"; (2) that another erroneous instruction was given with respect to the "quid pro quo" element of the bribery-related offenses; (3) that Jefferson's schemes to deprive citizens of honest services do not constitute federal crimes; and (4) that venue was improper on one of his wire fraud offenses.[1] As explained below, we

---

[1]In this appeal, Jefferson challenges his aggregate sentence of 156 months in prison only insofar as he contests his convictions.

affirm all of Jefferson's convictions save one, which we vacate for improper venue.

## I.

## A.

As a nine-term congressman, Jefferson represented the Second District of Louisiana, which includes most of the City of New Orleans. Jefferson, who was first elected to the House of Representatives in 1991, maintained congressional offices both in the District of Columbia and in New Orleans. He served on several committees and subcommittees of the House, including the Ways and Means Committee and its subcommittee on trade, and the Budget Committee. During his congressional tenure, Jefferson also served as co-chair of the Africa Trade and Investment Caucus and the Congressional Caucus on Nigeria.

In about March of 2005, the FBI and the Department of Justice began a comprehensive corruption investigation of Representative Jefferson.[2] More than two years later, on June 4, 2007, the federal grand jury in Alexandria returned a sixteen-count indictment charging him as follows:

- Count 1 — Conspiracy to solicit bribes, commit honest services wire fraud, and violate the Foreign Corrupt Practices Act, in violation of 18 U.S.C. § 371;

- Count 2 — Conspiracy to solicit bribes and commit honest services wire fraud, in contravention of 18 U.S.C. § 371;

---

[2]In 2006, Jefferson was reelected to the House of Representatives, despite the ongoing and publicly exposed corruption investigation.

- Counts 3 and 4 — Solicitation of bribes, in violation of 18 U.S.C. § 201(b)(2)(A);

- Counts 5 through 10 — Self-dealing and bribery-related honest services wire fraud, in contravention of 18 U.S.C. §§ 1343 and 1346;

- Count 11 — Foreign corrupt practices, in violation of 15 U.S.C. §§ 78dd-2(a), 78dd-2(g)(2)(A), and 78ff(a);

- Counts 12 through 14 — Money laundering related to bribery, in contravention of 18 U.S.C. § 1957;

- Count 15 — Obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1); and

- Count 16 — Conducting and participating in a racketeering enterprise, in contravention of 18 U.S.C. § 1962(c) (the "RICO offense").[3]

Three months later, on September 7, 2007, Jefferson sought the dismissal of Counts 2, 3, 10, 12, 13, and 14 for lack of venue, and the transfer of the balance of the indictment to the District of Columbia. On November 30, 2007, the district court, by summary order, denied the motion. After Jefferson sought reconsideration of the venue rulings, however, the district court issued a more formal opinion on June 27, 2008, reiterating and further explaining its decision. *See United States v. Jefferson*, 562 F. Supp. 2d 695 (E.D. Va. 2008) ("*Jefferson I*"). On September 7, 2007, Jefferson also moved to dismiss the bribery-related charges of the indictment (Counts 1-10, 12-14, and 16) on the basis that none are predi-

---

[3]In addition to alleging sixteen criminal offenses, the indictment made criminal forfeiture allegations relating to the proceeds of the alleged offenses.

cated on Jefferson's receipt of things of value "in return for . . . the performance of any official act." 18 U.S.C. § 201(b)(2)(A). Jefferson contended that none of those charges sufficiently alleged an "official act" under the bribery statute, 18 U.S.C. § 201(b).[4] In his motion to dismiss the bribery-related charges, Jefferson took the position that the definition of an "official act," set forth in 18 U.S.C. § 201(a)(3), is limited to those activities involving questions pending or brought before Congress, such as voting on proposed legislation or conducting committee work. Jefferson maintained that, as a result, each of the bribery-related charges is fatally flawed.

---

[4]The bribery statute, which is part of the 18 U.S.C. § 201 statutory scheme entitled "Bribery of public officials and witnesses," provides, in pertinent part:

> (b) Whoever —
>
> * * *
>
> (2) being a public official . . . directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for:
>
>> (A) being influenced in the performance of any official act;
>
> * * *
>
> shall be [guilty of an offense against the United States].

18 U.S.C. § 201(b)(2)(A). Pursuant to § 201(a)(3), the term "official act," as used in the bribery statute and the balance of § 201, is defined as

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

*Id.* § 201(a)(3).

The district court rejected Jefferson's position on what constitutes an official act by its opinion of May 23, 2008, ruling that, in proving an official act, the prosecution is obligated to satisfy two criteria:

> First, the act must be among the official duties or among the settled customary duties or practices of the official charged with bribery. And second, performance of the act must involve or affect a government decision or action.

*United States v. Jefferson*, 562 F. Supp. 2d 687, 691 (E.D. Va. 2008) ("*Jefferson II*"). Elaborating, the court explained that an official act may include those duties of a public official that are not defined in written rules, but that are otherwise "'clearly established by settled practice.'" *Id.* (quoting *United States v. Birdsall*, 233 U.S. 223, 230-31 (1914)). The court deemed the *Birdsall* decision as controlling, and further explained that the proper definition of an "official act" under the bribery statute encompassed such matters as Jefferson's official travel to foreign countries, his official correspondence to and meetings with domestic and foreign government officials, as well as the use of his congressional staff to facilitate other activities alleged in the indictment. The court thus declined to dismiss the bribery-related charges but specified that the government was obligated to prove at trial that Jefferson's alleged acts "(i) involve[d] the performance of an official duty or settled customary duty or practice and (ii) involve[d] or affect[ed] a government decision or action." *Jefferson II*, 562 F. Supp. 2d at 693.

On March 20, 2009, Jefferson moved for reconsideration of the district court's rulings in *Jefferson II* concerning the bribery-related charges, and the government sought clarification of that decision. As a result, on May 22, 2009, the court issued a follow-up opinion. *See United States v. Jefferson*, 634 F. Supp. 2d 595 (E.D. Va. 2009) ("*Jefferson III*"). In *Jefferson III*, the court clarified two of its rulings in *Jefferson II*.

First, the court emphasized that an official act must involve or affect a government decision or action. To satisfy this requirement, the bribery statute, embodied in 18 U.S.C. § 201(b)(2)(A), requires that the defendant himself, and not a third party, "be *influenced* in the *performance* of a decision or action." *Jefferson III*, 634 F. Supp. 2d at 601. That is, the "decision or action" must be made or done by the charged public official. *Id.* at 600-01. Second, the court explained that the statutory phrase "any public official" means the charged public official. *Id.* at 601. The *Jefferson III* decision further specified what could be deemed an official act under the bribery statute. Official acts are not, as *Jefferson III* explained, limited solely to legislative acts such as "voting on or introducing a piece of legislation." *Id.* at 602. The court thus affirmed its earlier ruling that such official acts include those actions that would ordinarily involve the legitimate use of an official's office. *Id.* (citing *United States v. Biaggi*, 853 F.2d 89, 96-99 (2d Cir. 1988)).

Jefferson's jury trial began in Alexandria on June 9, 2009, and continued for two months. It involved more than forty prosecution witnesses, plus two for the defense. Jefferson did not testify in his own defense. During the trial, the prosecution, in proving that the conduct underlying the bribery-related charges constitutes official acts, was guided by the district court's *Jefferson II* and *Jefferson III* decisions. The government thus presented evidence establishing that Jefferson's various meetings with foreign and domestic public officials on behalf of his myriad alleged bribers, coconspirators, and coschemers, as well as his use of congressional resources to correspond with such officials and coordinate foreign trips, were part of the well-settled congressional practice known as "constituent services." After the parties rested, the district court instructed the jury in a manner that was consistent with its earlier rulings. By the instructions, the court read and explained § 201(a)(3)'s statutory definition of an "official act," and charged the jury that

[a]n act may be official even if it was not taken pursuant to responsibilities explicitly assigned by law. Rather, official acts include those activities that have been clearly established by settled practice as part [of] a public official's position.

J.A. 5149.[5] The verdict reflected that the jury was convinced that Jefferson's meetings and communications with domestic and foreign public officials, as alleged in the bribery-related charges in the indictment, involved official acts.

### B.

By its verdict, returned on August 5, 2009, the jury convicted Jefferson on eleven of the sixteen counts of the indictment.[6] Jefferson's contentions on appeal challenge his convictions in the following respects:

(1) The district court's "official act" bribery instruction, which implicates each of Jefferson's eleven convictions, was fatally erroneous;

---

[5]Jefferson objected to the instructions in a consistent and timely manner. He asserted that the proper definition of an official act is much more circumscribed than the jury instructions indicated, as he had contended in the pretrial proceedings leading to *Jefferson II* and *Jefferson III*. *See* J.A. 4826-29. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[6]The jury acquitted Jefferson on Counts 5, 8, and 9 (honest services wire fraud offenses), Count 11 (the foreign corrupt practices offense), and Count 15 (the obstruction of justice offense). On August 6, 2009, by a special verdict returned on the indictment's forfeiture allegations, the jury found by a preponderance that the following property constituted proceeds derived from the offenses on which Jefferson had been convicted: $449,300 (Counts 1, 3, 4, and 16); $59,300 (Counts 6, 7, and 10); $21,353.47 (Counts 2 and 16); 30,775,000 shares of Class A stock in a business called iGate Incorporated; 1,500,000 shares of stock in an entity called W2-IBBS Limited; 1,500,000 shares of stock in a company called International Broad Band Services, LLC; and 600 shares of stock in a business called Multi-Media Broad Band Services. Jefferson does not contest the forfeiture verdict in this appeal.

(2) The court's "quid pro quo" bribery instruction, which implicates Jefferson's convictions under Counts 3 and 4, was also fatally erroneous;

(3) The Supreme Court has now repudiated the self-dealing honest services wire fraud theory on which Jefferson was prosecuted, undermining six of his convictions, that is, Counts 1, 2, 6, 7, 10, and 16; and

(4) There was a lack of venue in the Eastern District of Virginia on the Count 10 wire fraud offense.

Specifically, Jefferson first contends that each of his eleven convictions must be reversed because the district court tried his case under an unduly expansive and erroneous definition of an "official act" for purposes of the bribery statute. Jefferson maintains that an official act is more circumscribed than the jury instructions indicated, and that such an act "must concern a question resolvable through the formal *legislative* process, or, at most, as the D.C. Circuit held in *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007) (en banc), resolvable through a *governmental* process." Br. of Appellant 14. Jefferson asserts that his position on the definition of an "official act" is supported by the Supreme Court's decision in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), which, he insists, undercuts the district court's reliance on the *Birdsall* decision.

Jefferson next argues that, by misconstruing the bribery statute, the district court gave the jury an erroneous instruction on the "in return for" (also called the "quid pro quo") element of bribery relevant to Counts 3 and 4, instructing that the quid pro quo requirement could be satisfied by proof that Jefferson had agreed to perform unspecified official acts on an "as-needed basis."[7] Jefferson thus maintains that the court's

---

[7]As the district court explained, the bribery-related charges each require proof of a quid pro quo element. The court gave the following example:

instruction on the quid pro quo element also contravenes the Supreme Court's *Sun-Diamond* decision. *See* 526 U.S. at 414 (explaining, in illegal gratuity context, that "thing of value" must be linked to specific act for "which it was given").

Third, Jefferson contends that his convictions on Counts 1, 2, 6, 7, 10, and 16 must be reversed because they rest on the now-discredited self-dealing honest services wire fraud theory that he failed to properly disclose his (or his family's) financial interests in the businesses he was promoting. This conflict-of-interest theory, Jefferson maintains, was repudiated a year after his trial by the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010).[8]

Finally, Jefferson asserts that his Count 10 wire fraud conviction should be reversed because there was no venue for that offense in the Eastern District of Virginia. Count 10 involved a telephone communication from Africa to Kentucky, in furtherance of one of Jefferson's bribery schemes. According to Jefferson, inasmuch as the essential criminal conduct constituting the wire fraud offense, i.e., "the act of causing a wire to be transmitted," did not occur in Virginia, the Count 10 offense should not have been prosecuted there. *See* Br. of Appellant 54.

---

[T]he quid pro quo is satisfied if you find that the government has established beyond a reasonable doubt that the defendant agreed to accept things of value in exchange for performing official acts on an as-needed basis, so that whatever [sic] the opportunity presented itself, he would take specific action on the payor's behalf.

J.A. 5151.

[8]The Supreme Court determined in *Skilling* that 18 U.S.C. § 1346, which prohibits "a scheme or artifice to deprive another of the intangible right of honest services," criminalizes only those wire fraud schemes involving bribery and kickbacks, and not a defendant's failure to disclose self-dealing conflicts of interest. *Skilling*, 130 S. Ct. at 2933.

## II.

The indictment against Representative Jefferson — containing sixteen counts and spanning ninety-four pages — details the background of the various charges. The crux of the factual background consists of ten pages of "general allegations" laid out in thirty-eight numbered paragraphs, which are then realleged in each count. Those general allegations contain several that use coded terms, in lieu of proper names, such as the "CW" (for "cooperating witness"), "Nigerian Official A," and "Nigerian Company A" through "Nigerian Company G."

Focusing on the charges of conviction, Counts 1 and 2 make allegations of two criminal conspiracies involving Jefferson and others. Count 1, for example, alleges that the objects of the conspiracy were bribery and honest services wire fraud involving iGate Incorporated, various related persons and entities in the United States and Nigeria, and several members of Jefferson's family. Count 2 alleges a separate conspiracy, with its objects being bribery and honest services wire fraud with respect to schemes that are distinct from those in Count 1, involving different businesses and companies, plus Jefferson's family members.[9]

---

[9]With respect to the elements of the Count 1 conspiracy offense, the district court instructed the jury, in relevant part, as follows:

> First, that the conspiracy, agreement, or understanding to commit bribery as charged in the indictment [or] honest services wire fraud as alleged in the indictment . . . was formed or reached or entered into by two or more persons[;] Second, . . . that at some time during the . . . life of the conspiracy, agreement or understanding, that the defendant knowingly and intentionally joined the conspiracy; And third, that at sometime during the existence or life of the conspiracy, agreement or understanding, . . . a member of the conspiracy did one of the overt acts described in Count 1 . . . for the purpose of advancing, furthering or helping the object or purpose of the conspiracy.

J.A. 5131-32. A nearly identical instruction was given on the Count 2 conspiracy offense. *See id.* at 5141-42. The legal sufficiency of those instructions is not challenged on appeal.

In Counts 3 and 4 of the indictment, Jefferson is alleged to have solicited bribes in exchange for his official acts. Count 3 involves such a solicitation from iGate and its president for payments to a Jefferson family-controlled company called ANJ Group. Count 4 alleges a bribery solicitation from the CW (identified in the evidence as Virginia businesswoman Lori Mody), and her companies, International Broad Band Services, LLC ("IBBS"), and W2-IBBS Limited.[10]

Counts 6, 7, and 10 allege three honest services wire fraud offenses predicated on self-dealing and bribery that involving iGate's business ventures in Nigeria, Ghana, and elsewhere.[11]

---

[10]On the elements of the bribery offenses in Counts 3 and 4, the court instructed that the jury must find:

> First, that the defendant directly or indirectly demanded, sought, received or accepted, or agreed to receive or accept, anything of value, personally or for another person or entity; Two, that defendant was at the time a public official of the United States; and Three, that the defendant demanded, sought, received, accepted or agreed to receive or accept the item of value corruptly in return for being influenced in the performance of any official act.

J.A. 5147. Jefferson challenges both the "official act" and the "in return for" (i.e., "quid pro quo") aspects of that instruction on appeal.

[11]The district court instructed on the elements of the wire fraud offenses charged in Counts 6, 7 and 10 as follows:

> First, that the defendant knowingly devised or knowingly participated in a scheme to defraud the citizens of the United States and the United States House of Representatives of their intangible right to his honest services; Two, that the scheme or artifice to defraud involved a material misrepresentation or concealment of material fact; Three, that the defendant acted with intent to defraud; and Four, that in advancing or furthering or carrying out this scheme to defraud, the defendant transmitted or caused to be transmitted any writing, signal or sound by means of a wire communication in interstate and foreign commerce.

J.A. 5154. The court went on to instruct the jury that the wire fraud counts alleged two theories of honest services referred to in the first element: (1) bribery; and (2) intentionally failing to disclose material conflicts of interest in connection with his performance of official acts (also called "self-dealing"). *See id.* at 5156-57.

Counts 12 through 14 of the indictment charge Jefferson with three money laundering offenses, arising from his bribery activities, and the corresponding monetary transactions in criminally derived property.[12] Finally, Count 16, which encompasses thirty pages of allegations, charges the RICO offense and alleges twelve racketeering acts of bribery, self-dealing and bribery honest services wire fraud, and money laundering.[13]

For purposes of this appeal, we review the allegations and evidence in the context of five bribery and fraud schemes: (1) the iGate scheme; (2) the Arkel scheme; (3) the Melton

[12]The trial court instructed on the elements of the money laundering offenses charged in Counts 12 through 14, in pertinent part, as follows:

> First, that the defendant knowingly engaged or attempted to engage in a monetary transaction in or affecting interstate commerce; Second, that the defendant knew the transaction involved criminally . . . derived property[;] Third, that the property had a value of greater than $10,000; Fourth, that the property was, in fact, derived from bribery; and Fifth, that the transaction occurred in the United States.

J.A. 5180-81. The legal sufficiency of that instruction is not challenged on appeal.

[13]With respect to the RICO offense charged in Count 16, the district court instructed that the elements of the RICO offense were the following:

> First, . . . that an enterprise [Jefferson's congressional office] existed on or about the time alleged in the indictment; Second, that the enterprise engaged in or its activity affected interstate or foreign commerce; Third, that the defendant was employed by or was associated with the enterprise; Fourth, that the defendant participated, either directly or indirectly, in the conduct of the affairs of [the] enterprise; and Fifth, that the defendant knowingly participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity as described in the indictment, that is, through the commission of at [least] two of the charged racketeering acts within ten years of each other, or through causing or aiding and abetting the commission of two such racketeering acts.

J.A. 5193-94. The legal sufficiency of that instruction is also not challenged on appeal.

scheme; (4) the Wilson-Creaghan scheme; and (5) the International Petroleum scheme.[14] Although much of the conduct underlying Jefferson's various convictions occurred during the period from 2000 through 2003, it was the iGate scheme, which continued from 2000 through most of 2005, that ultimately led to the comprehensive FBI investigation into Jefferson's illicit activities.

## A.    The iGate Scheme[15]

### 1.

The indictment alleges that Jefferson solicited bribes from Vernon Jackson, the President of iGate, a Louisville, Kentucky telecommunications firm, in exchange for Jefferson's assistance in the promotion of iGate's telecommunications technology in Africa.[16] In return for monetary payments and the delivery of iGate shares to ANJ, the Louisiana company controlled by Jefferson's wife, the congressman sent letters on official congressional letterhead, conducted official travel, and met with domestic and foreign government officials to promote iGate's technology. In furtherance of the iGate ventures, Jefferson solicited bribes from a Nigerian company called Netlink Digital Television ("NDTV") that was pursuing a telecommunications venture with iGate in Africa. In return for

---

[14]The relevant facts are spelled out herein in the light most favorable to the government, as the prevailing party at trial. *See United States v. Madrigal–Valadez*, 561 F.3d 370, 374 (4th Cir. 2009) (observing that we review sufficiency of evidence to support conviction in light most favorable to government); *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998) (recognizing that, in reviewing legal conclusions and factual findings, "[w]e construe the evidence in the light most favorable to . . . the prevailing party below").

[15]The iGate scheme relates primarily to Jefferson's Count 1 conspiracy conviction, his Count 3 bribery conviction, his honest services wire fraud convictions under Counts 6, 7, and 10, and his Count 16 RICO conviction.

[16]At the time of Jefferson's trial, Jackson had been in prison for more than two years as a result of his related convictions.

a portion of NDTV's revenue, the delivery to ANJ of shares of NDTV stock, and the payment of fees, Jefferson performed various official acts, including meetings with Nigerian government officials to promote NDTV's venture with iGate.

The indictment also alleges that Jefferson induced Lori Mody to finance a telecommunications project in Africa using iGate's technology. Jefferson solicited bribes from Mody in the form of shares in W2-IBBS, the Nigerian company created by her to pursue the iGate venture. Jefferson also solicited monetary payments from Mody to his family members. In return for those bribes, Jefferson used his congressional office to promote W2-IBBS's interests in Nigeria and elsewhere. Jefferson also solicited bribes from Mody in the form of shares in IBBS, the Ghanaian company formed by her to pursue a telecommunications project in that country. In return, Jefferson sent letters on official congressional letterhead, conducted official travel to Ghana, and met with Ghanaian government officials to promote the interests of Mody, IBBS, and W2-IBBS in Ghana and elsewhere.

Jefferson introduced Mody to officials of the Export-Import Bank of the United States (the "Ex-Im Bank"), and sought the bank's financial assistance for Mody and her businesses.[17] Jefferson and Mody discussed and planned the bribery of various Nigerian government officials to facilitate the W2-IBBS projects. Pursuant to his discussions with Mody, Jefferson met with and agreed make bribe payments to Atiku Abubakar, the Vice President of Nigeria. Indeed, Jefferson received $100,000 in cash from Mody for the purpose of bribing Abubakar.

---

[17]The Ex-Im Bank is a credit agency of the United States designed to assist in financing the export of U.S. goods and services to international markets.

2.

a.

The trial evidence established that, in the year 2000, Jefferson became friends with Jackson, iGate's president. As a business, iGate focused on the development of technology that enabled high speed broadband services to be delivered at low cost over existing telephonic infrastructures. iGate's goals were to market and sell its technology to the military, to targeted African telecommunications and cable companies, and to "Historically Black Institutions located throughout the United States." J.A. 5266. In "mid to late" 2000, when Jackson sought to secure military contracts for iGate's products, Jefferson used his position as a congressman to promote iGate to the United States Army. *See id.* at 350. Specifically, in his promotion of iGate's products, Jefferson arranged meetings with Army officials, with an Army congressional liaison, and with Representative Billy Tauzin of Louisiana, who served as Chair of the House Subcommittee on Telecommunications, Trade, and Consumer Protection. As part of those efforts, Jefferson secured a letter of endorsement for iGate from Representative Tauzin, which Tauzin's staff understood was to be used on behalf of one of Jefferson's constituents.

After Jackson received favorable results from Jefferson's work in promoting iGate to the Army, Jefferson asked Jackson and iGate to hire ANJ, the Jefferson family consulting firm, to market iGate's products. Jackson testified that Jefferson

> approached me and he said to me, that he had been helpful to me but he could no longer spend the time with me or work with me on this product and services, and that I needed a company now to get with me and market these products to high-end decision makers in the corporate sector as well as government people. . . . He said, "Well, I know of a company,"

and he told me about the company. And he told me the company was ANJ. . . . And he said, "My wife and daughters own this company."

J.A. 364. On the basis of Jefferson's request, Jackson and iGate agreed to hire ANJ, and Jefferson provided Jackson with a draft contract for ANJ's services. The contract proposed a term of five years, and provided that iGate would pay ANJ with shares of iGate stock, plus $90,000 per year in twelve $7500 monthly payments, plus bonuses based on a percentage of iGate's profits. That contract was executed by Jackson (for iGate) and by ANJ president Andrea Jefferson (Jefferson's wife) on January 15, 2001.[18] Jefferson then proceeded to promote iGate's technology to his fellow congressmen. At trial, Jackson asserted that he was "paying [Jefferson] to help." J.A. 469. On January 22, 2002, Jackson transferred 100,000 shares of iGate stock to ANJ and, by September 2002, had transferred 550,000 iGate shares to ANJ.

In 2003, Jefferson began to promote iGate's technology abroad, travelling to West Africa to meet with high-ranking foreign officials. In Nigeria, Jefferson promoted iGate to Dumebi Kachikwu and Ahmed Vanderpuije, the founders of NDTV. Jefferson then facilitated an agreement between iGate and NDTV under which NDTV would use iGate's technology to establish satellite service in Nigeria. Without iGate's knowledge, Jefferson solicited from NDTV a portion of its profits from the iGate-NDTV venture, plus an ownership interest in NDTV. Vanderpuije and Kachikwu agreed to pay Jefferson a commission of five dollars on each "set top box" (a required component for a cable service subscription) because, as Vanderpuije explained, he was "excited about the fact that he could have a U.S. Congressman in his pocket." J.A. 1227, 1240. NDTV also agreed to pay iGate approximately $44,000,000, with a $6,500,000 down payment, for the

---

[18]Interestingly, ANJ was not actually formed as a legal entity until January 19, 2001, four days after the contract had been signed.

right to use iGate's technology in Nigeria. After that agreement was consummated, Jefferson successfully sought to have iGate increase its payments to ANJ from five to thirty-five percent of iGate's profits.

In promoting iGate, Jefferson also arranged for meetings between iGate, NDTV, and representatives of the Ex-Im Bank. Jefferson personally participated in those meetings and encouraged the Ex-Im Bank to fund the iGate-NDTV venture. Additionally, Jefferson arranged a meeting in 2003 with Jackson, Vanderpuije, Otumba Fashawe (another NDTV representative), plus Nigerian Vice President Abubakar, at which Jefferson urged Nigeria's support for the iGate-NDTV venture. As the venture fell into place in late 2003 and early 2004, ANJ collected more than $230,000 in fees from iGate to compensate Jefferson for his efforts in promoting iGate. When iGate was occasionally past due on payments to ANJ, Jefferson reminded Jackson of such delinquencies and sent ANJ invoices to iGate.[19]

During 2003 and 2004, Jefferson made multiple trips to Africa to meet with foreign officials and promote the iGate-NDTV venture. On one occasion in February 2004, Jefferson met with Nigerian President Olusegun Obasanjo to discuss the improvement of telecommunication infrastructure in that country "in a low cost way." J.A. 4270.[20] During his travels,

---

[19]For example, Jefferson advised Jackson by letter of December 27, 2004:

> When the money comes in a few days for the African project, I trust, that . . . iGate's debt to ANJ will be brought fully current. It now stands at $262,500, per the attachment. As you know, ANJ has a specific profit share agreement with iGate on the NDTV business, but this can wait for a better time.

J.A. 5369. The attachment being referred to was an ANJ invoice to iGate for $262,500, designated as "a request for payment of amounts currently due." *Id.* at 5370.

[20]While meeting with President Obasanjo in February 2004, Jefferson expressed an interest in exploring oil and gas opportunities in Nigeria — a venture that is the subject of another Jefferson scheme.

Jefferson consistently used his congressional passport, had his congressional staff accompany him, and used staff assistance to create trip itineraries and coordinate with the Department of State to schedule meetings with government officials. Jefferson also corresponded with foreign officials using his congressional letterhead, and he scheduled meetings with officials of domestic agencies to secure financing for the iGate-NDTV venture. Indeed, Mr. Kachikwu of NDTV described Jefferson's arrivals for meetings in Nigeria as being "in his full apparatus as a US congressman, with embassy security, embassy vehicles, introduc[ing] himself as a US congressman in charge of overseeing affairs of Nigeria or Africa." *Id.* at 1313.

b.

The trial evidence reflected that the iGate-NDTV venture foundered in approximately 2004, and iGate agreed that it would refund to NDTV the sum of $3,500,000, a major portion of the $6,500,000 down payment NDTV had already paid iGate. As the iGate-NDTV venture faltered, however, Jefferson managed to secure a replacement for NDTV's role in the iGate scheme, that is, Lori Mody, who then represented a company called W2 Limited. Mody was first introduced to Jefferson by one of his former legislative aides, Brett Pfeffer.[21] On behalf of W2 Limited, Mody entered into an investment agreement with Jackson and iGate after Jefferson assured her that he could secure financing for iGate's African ventures through the Ex-Im Bank. He also assured her that he could secure the necessary cooperation of the Nigerian government.

---

[21]Pfeffer worked as Jefferson's legislative assistant for approximately three years before leaving in 1998 to become a consultant. He was eventually hired by Mody as president of W2-IBBS to solicit investment and development opportunities in start-up companies. As president of W2-IBBS, Pfeffer was paid $700,000 per year, plus fifty percent of the profits made in any opportunity he "brought to the table." J.A. 1925. For his involvement in the iGate scheme, Pfeffer was convicted and sentenced to ninety-six months in prison.

Mody and W2 Limited's contract with iGate, effective July 21, 2004, provided that W2 Limited would own the distribution rights for iGate's technology in Nigeria in exchange for a payment to iGate of $44,934,400. The parties to the contract expected that Mody would fund $3,500,000 of this amount and that the Ex-Im Bank would finance the balance. As a result, Mody created W2-IBBS to be used exclusively for the iGate-Mody aspect of the iGate scheme. Jefferson assisted Mody and Jackson in negotiating and drafting the terms of that contract, and the congressman requested compensation from Mody for his efforts. Such compensation was to include payments to ANJ, ownership interests in Mody's businesses, and payments to other businesses owned by Jefferson's family. In return, Jefferson continued to correspond and meet with African government officials to promote the iGate-Mody venture.

Mody and W2-IBBS made an initial payment of $1,500,000 to iGate in July 2004, and a day later Jackson remitted to ANJ the sum of $50,000. In September 2004, Mody and W2-IBBS made their second payment to iGate, in the sum of $2,000,000. Jackson promptly paid another $50,000 to ANJ. Notably, ANJ never performed any work for iGate.

In late 2004 and early 2005, despite Jefferson's efforts, the iGate-Mody venture began to unravel. Mody grew concerned with the propriety of Jefferson's conduct and, in March 2005, acted on her suspicions and contacted the FBI. She then turned against Jefferson and began to cooperate with the FBI and the Department of Justice.

With the FBI monitoring their relationship, Jefferson and Mody renewed their efforts to pursue the iGate-Mody venture in Nigeria. Jefferson assured Mody that he was committed to the success of iGate's ventures in Nigeria and other West African countries, but continued to demand payments from Mody, including an ownership interest in W2-IBBS for

Global Energy and Environmental Services, an entity owned by Jefferson's daughters. Acting on Mody's behalf, Jefferson made further efforts to assist the iGate-Mody venture, including visiting Ghana in July 2005 to — at least in part — promote the iGate scheme to Ghanaian government officials. After Jefferson's return from Ghana, his office completed an official travel disclosure form confirming that one of Mody's companies had sponsored his trip, and affirming that his travel to Africa was "in connection with [Jefferson's] official duties and would not create the appearance that [he] is using public office for private gain." J.A. 6175.[22]

In his negotiations with Mody, Jefferson constantly sought additional compensation for himself and his interests. Those negotiations were conducted mostly in a clandestine manner, through cryptic notes and coded messages. Nevertheless, Jefferson made a comment to Mody that revealed his apprehension concerning the propriety of their dealings. During a monitored meeting with Mody on May 12, 2005, Jefferson remarked, "All these damn notes we're writing to each other, as if we thought . . . [the] FBI's watching us." J.A. 2321.[23] At a July 30, 2005 meeting with Jefferson, Mody received from him a document entitled "Cash Requirements," which reflected so-called "project costs" for the iGate-Mody venture in Nigeria and Ghana. *Id.* at 5631. This document provides for four disbursements: (1) $8,389,000 to a bank account under the name of Multi-Media Broad Band Services; (2) $145,000 to ANJ; (3) $1,000,000 to the "Global Energy Account"; and (4) $500,000 to an otherwise unexplained account called

---

[22]Jefferson's congressional office submitted similar travel disclosure forms for other trips relating to his bribery and fraud schemes, including a February 2003 trip to Nigeria and a February 2004 trip to Nigeria, Cameroon, Equatorial Guinea, and Sao Tome and Principe.

[23]During an FBI-monitored telephone conversation with Jefferson in mid-2005, Jackson suggested replacing Mody with a new investor. Jefferson responded, "We've got to do this shit right, though. I mean, otherwise, we're going to all be in the goddamn pokey somewhere, fooling with . . . shit like this." J.A. 783-84.

"Valenti Firm Escrow Account." *Id.* at 5631-32. Multi-Media Broad Band Services was a business entity created by Jefferson, with Mody on its board. Having reached suitable compensation arrangements with Mody, Jefferson pressed on, seeking cooperation from the governments of Nigeria and other West African countries for the iGate scheme, and specifically the iGate-Mody venture.

During the iGate scheme, Nigeria Telecommunications Limited ("NITEL"), the country's primary telephone carrier, was controlled by the Nigerian government. In order for the iGate scheme to succeed in Nigeria, iGate needed access to NITEL's telephone lines. To secure NITEL's cooperation, Jefferson met with Nigerian Vice President Abubakar on July 18, 2005, and offered him a percentage of the profits from the iGate-Mody venture. In addition to such "back-end compensation," Jefferson sought to have Mody pay Abubakar $500,000 in cash on the "front end," that is, immediately, in order to ensure his cooperation. *See* J.A. 2752-60; 6289-91. In furtherance of that plan, Mody obtained $100,000 in marked cash from the FBI and placed it in a briefcase. On July 30, 2005, outside a hotel in Arlington, Virginia, Mody delivered the briefcase containing the money to Jefferson, who was to deliver it to Abubakar. The conversations between Jefferson and Mody concerning this illicit payment were monitored and recorded by the FBI. Despite indicating to Mody on August 1, 2005, that he had already delivered the $100,000 cash payment to Abubakar, Jefferson was still in possession of at least $90,000 of the bribe money.

Two days later, FBI agents visited Jefferson's New Orleans home. Jefferson admitted the agents into his residence at about 7:00 that morning, and agreed to speak with them. During the FBI interview, Jefferson concealed his activities involving iGate and Mody and falsely responded to the inquiries. Later that day, the FBI executed six search warrants with respect to the Jefferson investigation: (1) Jefferson's District of Columbia residence; (2) his vehicle in the District of

Columbia; (3) his New Orleans residence; (4) the New Orleans office of the Jefferson family accountant; (5) Vice President Abubakar's Potomac, Maryland residence; and (6) iGate president Vernon Jackson's home in Kentucky. During their search of Jefferson's D.C. home, the FBI agents found and seized $90,000 of the marked Abubakar cash, which was concealed in frozen food boxes in the freezer.

## B.   The Arkel Scheme[24]

### 1.

Contemporaneously with the early part of his involvement in the iGate scheme, Representative Jefferson engaged in a separate scheme that involved soliciting and receiving bribe payments from businessman George Knost and his business entities, Arkel International, Arkel Sugar, and Arkel Oil and Gas (collectively, "Arkel"). As spelled out in the Count 2 conspiracy charge, Jefferson, in return for such payments, performed various official acts, including endorsing an Arkel venture to officials of the Ex-Im Bank and promoting Arkel's interests to Nigerian government officials.

### 2.

The trial evidence confirmed that Jefferson solicited bribes from several American businesses, in addition to iGate, that aspired to do business in West Africa. Jefferson spoke favorably to his African government contacts on behalf of such businesses, including Arkel, but demanded that, in exchange, they pay members of Jefferson's family so-called "consulting" fees. Jefferson's consulting fee demands amounted to millions of dollars.

---

[24]The Arkel scheme relates primarily to Jefferson's Count 2 conspiracy conviction and his Count 16 RICO conviction.

One such arrangement between Jefferson and Arkel concerned a sugar factory feasibility study and construction contract in Nigeria. Knost, Arkel's President, first met Jefferson in August of 2000 when Knost wanted to travel with a government delegation to Africa. Knost and Arkel were interested in developing sugar factory projects in Nigeria and, as a result, contacted Jefferson's office seeking assistance with respect to the delegation. Knost informed Jefferson that the sugar projects were worth as much as $300,000,000 each.

About a year later, in the fall of 2001, Knost met with Jefferson at Arkel's offices in Baton Rouge, Louisiana. Those in attendance included Ibrahim Turaki, the Governor of Jigawa State, Nigeria, and the congressman's brother, Mose Jefferson. At that meeting, Representative Jefferson promoted Arkel's proposed sugar projects to Governor Turaki. Knost and Jefferson then had a private conversation where, according to Knost, Jefferson said, "'You need to hire my brother, Mose, as a consultant, you know, to handle this deal.'" J.A. 2995-96. During dinner with Jefferson and Mose, Knost discussed with Jefferson the assistance that the congressman could provide Arkel in terms of general promotion, facilitating the sugar projects' feasibility study, and securing an Arkel contract to construct the Nigerian sugar factories. As Knost understood it, Arkel's hiring of Mose was a "prerequisite" to obtaining Jefferson's assistance on its sugar factory endeavors in Nigeria, even though Knost did not expect Mose to perform any work on Arkel's behalf.

Arkel thereafter agreed with Representative Jefferson that Mose Jefferson would be paid four to five percent of Arkel's profits on the sugar contracts, in the event Arkel was selected to construct the Nigerian factories. Arkel and Governor Turaki then agreed to proceed with the factories' feasibility study in Jigawa, with Arkel to be paid $500,000 for its work. For his part, Jefferson assisted Arkel representatives in obtaining visas for travel to Nigeria, scheduled meetings for Arkel with Nigerian government officials, and sought to

resolve payment issues that arose between Arkel and Jigawa State. On July 27, 2001, Jigawa paid $187,230 to Arkel, after Arkel Sugar had been created to develop the Nigerian sugar projects. On August 15, 2001, a Mose Jefferson shell entity, Providence International, invoiced Arkel for $7489, which was paid one week later.[25] Jigawa thereafter made further payments to Arkel, including $85,000 in December 2001 and $260,000 in April 2002. Arkel then paid four percent of each of those payments to Providence International.

In August 2001, Knost also sought the assistance of Jefferson and his brother Mose for a potential business venture in Nigeria to develop so-called "marginal oil fields."[26] Knost agreed to pay another of Mose's shell entities, BEP Consulting Services, to secure Jefferson's assistance in obtaining Nigerian government cooperation with Arkel's interests in the marginal oil field venture. Jefferson then assisted Arkel's efforts, meeting with and seeking aid from foreign and domestic government officials and helping to gain financing for the venture from the Ex-Im Bank.

## C.   The Melton-TDC Scheme[27]

### 1.

The conspiracy charged in Count 2 of the indictment includes allegations concerning a scheme in which Representative Jefferson solicited and received bribes from businessman John Melton and a company called TDC Energy

---

[25]The sum of $7489 paid to Providence International by Arkel in August 2001 was four percent of the $187,230 that Jigawa had paid Arkel one month earlier.

[26]At trial, Knost described a "marginal oil field" as "an oil field that had been either discovered and not produced, or discovered and produced some period of time and became uneconomic." J.A. 3046.

[27]The Melton-TDC scheme relates primarily to Jefferson's Count 2 conspiracy conviction and his Count 16 RICO conviction.

Overseas, Inc.[28] In return for bribe payments from TDC, Jefferson performed various official acts, including the promotion of TDC's interests in the development of the Nigerian marginal oil fields with Nigerian government officials and with officials of the United States Trade and Development Agency (the "USTDA").[29] In particular, Jefferson sought to have the USTDA provide financial assistance to TDC for its marginal oil field ventures.

2.

Knost realized in approximately September 2001 that he would be unable to successfully pursue Arkel's marginal oil field venture in Nigeria. As a result, he offered John Melton, an ex-Arkel employee, the opportunity to take over. Melton created TDC for that purpose, but after assessing a proposed agreement between Arkel and Mose Jefferson's firm BEP concerning the marginal oil field venture, TDC declined to be involved, primarily because BEP's requested fees were thought to be excessive. Melton later decided to further pursue the oil field venture, however, with two partners, Ramon Jarrell and Jim Creaghan. Creaghan, who was a lobbyist from Louisiana, was to act as liaison between TDC and Representative Jefferson.

In approximately December 2001, four of the TDC schemers — Melton, Jarrell, Creaghan, and Jefferson — met in Louisiana to discuss the marginal oil field venture, as well as other potential projects in West Africa. Jefferson proposed a trip to Nigeria in January 2002 to meet with Nigerian government officials. Jefferson informed the TDC partners, however,

---

[28]In the indictment, Melton and TDC are identified only as "Businessperson G" and "Company G."

[29]The USTDA is an agency established to promote United States private sector participation in development projects in developing and middle-income countries, with special emphasis on economic sectors with significant U.S. export potential.

that before he could arrange such a trip they would have to agree to hire and pay his brother Mose for consulting services. That request was agreed to, and the TDC group prepared for the trip to Nigeria.

Melton, on behalf of TDC, prepared a proposed agreement with respect to the venture and other West Africa projects, to be executed between TDC and BEP. TDC's proposal, dated January 10, 2002, identified several projects, including an oil field project, a pharmaceutical project, and a fertilizer plant project. The proposal promised that BEP would receive three percent of the net profit on all such projects. When Melton presented the proposal to Jefferson, however, the congressman rejected it, simply stating that "this won't do." J.A. 3497. After Melton promised that Mose's interests in the projects would be assured to Jefferson's satisfaction, Jefferson agreed to move forward.

In January 2002, Melton and his TDC partners accompanied Representative Jefferson and Mose to Nigeria. That was Mose's first trip to Nigeria, and TDC paid the travel expenses. During the trip, Jefferson arranged meetings between TDC and the Governor of the Nigerian State of Akwa Ibom. As a result, Melton secured a letter of intent from the Governor to move forward with TDC on the fertilizer plant project.

Afterward, in April 2002, Melton, Jarrell, and Creaghan applied for a USTDA grant to fund a TDC feasibility study for a Nigerian fertilizer plant. Jefferson was instrumental in the success of that grant application, having also secured the support of the Governor of Akwa Ibom. As a result, TDC received a $450,000 grant from the USTDA. At trial, the USTDA Director's Chief of Staff described Jefferson's involvement with TDC's fertilizer plant grant application as "not typical." J.A. 3929.

### D.   The Wilson-Creaghan Scheme[30]

---

[30]The Wilson-Creaghan scheme primarily relates to Jefferson's Count 2 conspiracy conviction and his Count 16 RICO conviction.

1.

Count 2 of the indictment also alleges that Jefferson, through "Lobbyist A" (the coded identification for Creaghan), solicited bribe payments from "Businessperson BC" (Noreen Wilson), in return for Jefferson's assistance in resolving a dispute over oil exploration rights in the waters off Sao Tome and Principe.[31] For that assistance, Jefferson was promised bribe payments by Wilson and Creaghan, either directly or through a nominee company.

The indictment also alleges that Jefferson solicited and received bribes from "Company C," an entity called Life Energy Technology Holdings, in which Creaghan and Wilson were involved. Life Energy was engaged in manufacturing and distributing energy-related technology. In return for bribe payments from Life Energy, Jefferson travelled to Nigeria, Equatorial Guinea, Cameroon, and Sao Tome and Principe. He met with several government officials of those countries to promote Life Energy's technology.

2.

The trial evidence was that Creaghan first met Wilson, a Florida businesswoman, in 2001. In December of that year, Creaghan discussed with Wilson the acquisition and development of oil exploration rights near Sao Tome and Principe. Wilson was involved in a South African business called Procura Financial ("Company B") that dealt with oil drilling off the coast of West Africa. In pursuing the Sao Tome and Principe oil exploration venture, Creaghan and Wilson approached Jefferson in late 2001, on behalf of Procura Financial, and sought his assistance in overcoming barriers that were holding up their oil contracts. These barriers included ownership disputes among various oil companies

---

[31]Sao Tome and Principe is a small island republic off the coast of the West African nation of Gabon.

and problems among the governments of several African nations. Jefferson sought to assist in resolving these disputes, but informed Creaghan and Wilson that, in exchange for his help, it was necessary for them to assign an ownership interest in the ventures to members of Jefferson's family. Subsequently, Creaghan, Wilson, and Jefferson arranged for Mose Jefferson to receive an ownership interest in the Sao Tome and Principe venture.

Notwithstanding Jefferson's efforts, the barriers and disputes were never resolved, and the Sao Tome and Principe oil exploration venture failed. Creaghan and Wilson continued to work together, however, and in 2003 became involved with Life Energy, which manufactured a product called "Biosphere," a waste treatment plant that produced electricity and potable water from waste. When Creaghan and Wilson sought to market Biosphere in West Africa, they contacted Jefferson for assistance. Jefferson was interested in their request, but again demanded that Mose be involved. Life Energy agreed to pay Mose — through Providence International — ten percent of each Biosphere project that was sold (a Biosphere project was priced at $6,500,000). Mose was also to receive an ownership interest in the Biosphere business in West Africa. As a result, Jefferson agreed to assist Life Energy in selling its products to West African countries. Creaghan, Jefferson, and Mose travelled again to Nigeria in February 2003 to promote the marketing of Biosphere. During their meetings with officials of several Nigerian states, Jefferson encouraged those governments to invest in Life Energy's Biosphere units.

E.   The International Petroleum Scheme[32]

---

[32]The International Petroleum scheme relates primarily to Jefferson's Count 16 RICO conviction.

1.

The indictment specifies that, in 2002, Jefferson solicited bribes from "Businessperson A" (Noah Samara) and a company called International Petroleum (which Jefferson caused to be formed), in exchange for Jefferson advancing Samara's efforts to obtain oil concessions from the government of Equatorial Guinea. In furtherance of that bribery and fraud scheme, Jefferson flew to Equatorial Guinea and met with high-ranking government officials.

2.

The trial evidence revealed that Samara, who founded a satellite radio business called WorldSpace, Inc., first met Jefferson in the late 1990s. The two men became friends, and Samara was a contributor to Jefferson's political campaigns. In the fall of 2001, Samara agreed to lend Jefferson $50,000 after the congressman falsely promised he would properly disclose the loan. Jefferson also promised to repay the loan by September 2004, though he never did.

In May 2002, Samara visited several countries in Africa to pursue a project by which WorldSpace would deliver satellite-based educational services to African countries. Samara expected WorldSpace's revenue from the project to be approximately $3,000,000. Jefferson accompanied Samara on portions of this trip, including visits to Equatorial Guinea, the Democratic Republic of the Congo, and Botswana. In preparing for his trip to Africa, Samara did not intend to visit Equatorial Guinea, the Congo, or Botswana, and only agreed to do so at Jefferson's suggestion. Their visits to those additional African countries required the charter of an aircraft, which cost WorldSpace more than $70,000. During the side trip, Jefferson proposed that Samara get involved in an oil drilling project in Equatorial Guinea, even though Samara had no experience in the oil business. After visiting Equatorial Guinea, Jefferson made a proposal to Samara under which

Equatorial Guinea would grant Samara an oil concession. Notwithstanding Samara's discomfort with the proposal, Jefferson recommended that Samara form International Petroleum and pursue the Equatorial Guinea oil venture. Jefferson also suggested that Samara hire one of Jefferson's daughters, an attorney, to assist with International Petroleum's legal work, and that Samara give Jefferson's daughter an ownership interest in the business. Jefferson abandoned the oil concession venture, however, because Samara refused to give Jefferson's daughter an interest in it. Samara also never accepted the oil concession from Equatorial Guinea.

In July 2002, after their trip to Africa, Samara met with Jefferson and his wife to discuss the WorldSpace educational initiative. That meeting primarily involved conversations between Samara and Representative Jefferson, and resulted in Samara agreeing to hire ANJ. During the meeting, Jefferson prepared a proposed consulting contract between WorldSpace and ANJ, under which WorldSpace, "[i]n the event that ANJ makes a material contribution to the procurement of an agreement between WorldSpace and any developing country to provide educational offerings through the satellite receiver technology," would compensate ANJ with four percent of the gross amount paid under any such agreement. J.A. 3422. Samara understood that the agreement would obligate ANJ to assist WorldSpace in procuring contracts in Botswana, Equatorial Guinea, and the Democratic Republic of the Congo, but that ANJ would not provide consulting services for the educational content of any project. Notably, Samara understood that only Representative Jefferson — and neither his wife nor ANJ — would be assisting with those contracts. Consistent with Samara's understanding, Jefferson wrote several letters to the President of the Democratic Republic of the Congo, using his congressional letterhead, urging consideration of the WorldSpace satellite education proposal. According to Samara, the WorldSpace venture "slowed down" after the summer of 2002, and he did not further pursue any educational initiatives in Africa with Jefferson. *Id.* at 3434.

III.

A.

Turning to Jefferson's first contention of error, we must assess whether the district court improperly and erroneously instructed the jury on what constitutes an "official act" under the federal bribery statute. We review de novo the claim that a jury instruction failed to correctly state the applicable law. *See Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 235 (4th Cir. 2000). In conducting such a review, "we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996).

1.

As background for our assessment, we identify and discuss the relevant legal principles underlying the parties' conflicting contentions regarding the proper definition of an "official act." The official act issue requires our assessment of the viability and applicability of the Supreme Court's century-old decision in *United States v. Birdsall*, 233 U.S. 223 (1914). There, the Court recognized, under a predecessor bribery statute, that for a public officer's action to be "official,"

> it was not necessary that it should be prescribed by statute; it was sufficient that it was governed by a lawful requirement of the department under whose authority the officer was acting. Nor was it necessary that the requirement should be prescribed by a written rule or regulation. It might also be found in an established usage which constituted the common law of the department and fixed the duties of those engaged in its activities. *In numerous instances, duties not completely defined by written rules are*

*clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery.*

*Id.* at 230-31 (emphasis added) (citations omitted).[33]

In the *Birdsall* case, Thomas Brents and Everett Van Wert were "special officers, duly appointed by the Commissioner of Indian Affairs, under the authority of the Secretary of the Interior, for the suppression of the liquor traffic among the Indians." 233 U.S. at 228. The two men were indicted in Iowa for accepting bribes, in violation of § 117 of the Criminal Code. *Id.* at 227. Another defendant, attorney Willis Birdsall, was indicted separately for giving bribes to Brents and Van Wert, in violation of § 39 of the Criminal Code, in exchange for their actions as Indian Affairs special officers, in advising the Commissioner of Indian Affairs (contrary to the truth) that leniency should be applied to individuals convicted for liquor trafficking with Indians. *Id.* at 229-30. Brents and Van Wert were charged with receiving bribes from Birdsall with the intent that their official actions be influenced, in contravention of the applicable statute. *Id.*

The district court in Iowa ruled that each of the indictments was defective and sustained the defendants' demurrers to

---

[33]When *Birdsall* was decided, the pertinent bribery statute provided, in relevant part, that

"whoever, being an officer of the United States, or a person acting for or on behalf of the United States, in any official capacity, under or by virtue of the authority of any department or office of the government thereof," accepts money, etc., "with intent to have his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, influenced thereby," shall be punished as stated.

*Birdsall*, 233 U.S. at 230 (quoting Crim. Code § 117, 35 Stat. at L. p. 1109, chap. 321, U. S. Comp. Stat. Supp. 1911, p. 1623).

them, agreeing that no offenses were charged. In the trial court's view, there was no act of Congress that conferred a duty on the Department of the Interior or its Bureau of Indian Affairs to make recommendations of leniency to the executive or judicial branches. As a result, the court concluded, Brents's and Van Wert's recommendations could not constitute official acts under the bribery statute.

The Supreme Court reversed the district court's judgment, explaining that acts reached by the bribery statute extend beyond those acts that are "prescribed by a written rule." *Birdsall*, 233 U.S. at 231. The *Birdsall* Court thus held that "[e]very action that is within the range of official duty comes within the purview of these sections." *Id.* at 230.

The federal bribery statute was revised in 1962, nearly fifty years after the *Birdsall* decision, to its current provision in 18 U.S.C. § 201(b). The only notable distinction between the bribery statute as it existed in 1914 and the present version is that the predecessor version, instead of using the term "official act," employed the phrase "decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit." *See Birdsall*, 233 U.S. at 230. Although § 201(b)(1)(A) replaces that phrase with the two words "official act," the bribery statute now uses the substance of the predecessor's phrase to define an "official act" under § 201. That is, the present definition of an official act, spelled out in § 201(a)(3), draws specific definitional language from its 1914 predecessor. Put succinctly, there is simply no distinction in substance between an official act as defined by *Birdsall*, and an official act under Jefferson's indictment. *See United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) (recognizing that "[t]he terms of the written definition of official act have not been altered to any substantial extent since their origin in the Act of July 13, 1866, ch. 184, § 62, 14 Stat. 168").

In light of the foregoing, the government relied on the *Bird-sall* decision to support its position on the "official act" issue raised in this case. And the district court agreed with the government's position, as explained in the court's *Jefferson III* opinion. Accordingly, the court instructed the jury as follows:

> An act may be official even if it was not taken pursuant to responsibilities explicitly assigned by law. Rather, official acts include those activities that have been clearly established by settled practice as part [of] a public official's position.

J.A. 5149.

### 2.

On the other hand, Jefferson contended in the district court, and continues to maintain on appeal, that the Supreme Court's more recent decision in *United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999), forecloses the use of a "settled practice" instruction on official acts under the bribery statute. In *Sun-Diamond*, rather than examining the bribery statute, the Court examined the requirements for a violation of the illegal gratuity statute, found in 18 U.S.C. § 201(c) — the bribery statute's lesser included offense and close cousin.[34]

The defendant in *Sun-Diamond* was a trade association that gave thousands of dollars worth of gifts (i.e., tickets to sporting events, luggage, and meals) to the Secretary of Agriculture when his Department had matters pending that would affect the trade association and its members. The *Sun-Diamond* decision began its discussion by distinguishing the

---

[34]The illegal gratuity statute provides, in relevant part, as follows: "Whoever . . . directly or indirectly gives, offers, or promises anything of value to any public official . . . for or because of any official act performed or to be performed by such public official [shall be guilty of a crime against the United States]." 18 U.S.C. § 201(c)(1)(A).

illegal gratuity statute from the bribery statute. As the Court recognized, although they are subsections of the same statutory scheme — and subject to the same definitions — an act of bribery requires the giving of something of value in exchange for an official act. *See Sun-Diamond*, 526 U.S. at 404. On the other hand, an illegal gratuity "may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 405.

The *Sun-Diamond* Court declined, therefore, to read the illegal gratuity statute so broadly as to prohibit "gifts given by reason of the donee's office." 526 U.S. at 408. To do so, the Court reasoned, "would criminalize, for example, token gifts to the President based on his official position and not linked to any identifiable act — such as the replica jerseys given by championship sports teams each year during ceremonial White House visits[.]" *Id.* at 406-07. Warning against an expansion of the illegal gratuity statute to prohibit such gifts, the Court advised that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Id.* at 412. Thus, the Court ruled that gifts by a trade group of farmers to the Secretary of Agriculture, at a time when matters affecting the farmers were pending in the Department, were not barred by the illegal gratuity statute, because such offerings were not directly connected to any specific official act or acts taken or to be taken on the matters of interest to the farmers. *Id.* at 414.

3.

Jefferson claims to find support for his reading of *Sun-Diamond* in *Valdes v. United States*, a 2007 en banc decision of the District of Columbia Circuit. *See* 475 F.3d 1319 (D.C. Cir. 2007). Valdes, a police officer, was charged with contravening the bribery statute by accepting money from an undercover informant in exchange for accessing the police database for information such as license plate numbers, addresses, and

outstanding warrants. Although Valdes was indicted on brib-
ery charges, a jury convicted him on three counts of the lesser
included offense of receipt of an illegal gratuity. *Id.* at 1322.

The D.C. Circuit reversed Valdes's convictions because his
actions amounted to "moonlighting," or misusing government
resources, and did not fit into the statutorily required "ques-
tion, matter, cause, suit, proceeding or controversy." *Valdes*,
475 F.3d at 1323-24. The *Valdes* court relied on the *Sun-
Diamond* decision, seizing on the Supreme Court's discussion
of the customary activities of a public official that do not con-
stitute official acts, and asserting that the *Sun–Diamond* Court
"reached its conclusion 'through the definition of' [official
act,]" *Valdes*, 475 F.3d at 1323 — a proposition we are
unwilling to accept.[35] The D.C. Circuit recognized *Birdsall*'s
ruling that an "official act" need not be prescribed by statute,
but concluded that *Birdsall* did not "stand for the proposition
that every action within the range of official duties *automati-
cally* satisfies § 201's definition; it merely made clear the cov-
erage of activities performed as a matter of custom." *Valdes*,
475 F.3d at 1323.

4.

At bottom, Jefferson contends that the definition of an offi-
cial act used by the trial court, particularly its inclusion of the
"settled practices" of a public official, is "hopelessly indeter-
minate" and overly general, rendering the bribery statute "un-
constitutionally vague." *See* Br. of Appellant 18.[36] As a result,
he maintains that each of his convictions is fatally flawed.

---

[35]As we discuss further below, *see infra* Part III.A.5, our reading of
*Sun-Diamond* reveals that the Court did not rely on the official act defini-
tion to the exclusion of the rest of the illegal gratuity statute. Rather, the
Court merely referenced that definition to defeat any potential argument
that *Sun-Diamond*'s narrowing of an illegal gratuity would be miscon-
strued as overly inclusive. *See Sun-Diamond*, 526 U.S. at 408 (recognizing
that any overly inclusive or "absurd" results of narrowing ambit of illegal
gratuity may be eliminated "*through the definition of [official act]*").

[36]Though Jefferson suggests that the district court's construction of the
bribery statute renders the statute "unconstitutionally vague," he does not

The boundaries fixed by the Supreme Court in *Birdsall* fall well within the bribery statute, however, and have never been altered. *See United States v. Moore*, 525 F.3d 1033, 1041 (11th Cir. 2008) (deeming *Birdsall* "relevant Supreme Court precedent" on definition of official act); *United States v. Parker*, 133 F.3d 322, 326 (5th Cir. 1998) (citing *Birdsall* for proposition that official act may be found in "established usage"); *United States v. Biaggi*, 853 F.2d 89, 97 (2d Cir. 1988) (relying on *Birdsall* to rule that official acts in the bribery statute "encompass[ed] all of the acts normally thought to constitute a congressman's legitimate use of his office"); *United States v. Morlang*, 531 F.2d 183, 192 (4th Cir. 1975) (recognizing *Birdsall*'s holding that, under the bribery statute, "the official action sought to be influenced need not be prescribed by statute but may be governed by a lawful requirement of the executive department under whose authority the official is acting"). We must, as explained below, reject Jefferson's challenge to the district court's official act instruction because it squares with the *Birdsall* precedent. The *Sun-Diamond* decision does not require us to rule otherwise, and Jefferson's acts are encompassed in both the *Birdsall* "settled practices" and the statutory definitions of an official act.

5.

Jefferson argues that the link between a specific official act and a thing of value, required by *Sun-Diamond*, cannot be squared with the "settled practices" instruction used in this

---

provide any argument regarding the elements of an impermissibly vague statute, but instead poses a series of sixteen rhetorical questions. *See Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1079 (4th Cir. 2006) (recognizing that "[a] statute is impermissibly vague if it either (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement" (internal quotation marks omitted)); Br. of Appellant 18. We therefore deem it unnecessary to conduct a vagueness analysis with respect to the bribery statute.

case. He asserts that the bribery statute, if read to encompass a public official's settled practices, would criminalize such customary activities as the President receiving sports teams at the White House, and "the Supreme Court definitively has said otherwise." Br. of Appellant 26. Jefferson's contention, however, misses the mark. There is simply no indication that *Sun-Diamond* sought to undermine *Birdsall*'s holding. Indeed, *Sun-Diamond* did not mention *Birdsall* at all — a curious omission if the Court intended to overturn its landmark decision on the definition of "official act." In *Sun-Diamond*, the Court was concerned with an unwarranted extension of the illegal gratuity statute to prohibit any gifts to public officials. Rather than ruling on what constitutes an official act, the Court simply embraced a narrow reading of the illegal gratuity statute, deciding that a connection between the payment or gift and a specific official act was required, as opposed to those gratuities given simply because of status or in order to "create a reservoir of goodwill." *See Sun-Diamond*, 526 U.S. at 405.

The only analysis by *Sun-Diamond* of the definition of an official act comes as a rebuttal to the hypothetical impact of the Court's narrow reading of the illegal gratuity statute. *See* 526 U.S. at 407. The Court addressed the possibility that its narrow interpretation could lead to "absurd" results, in that gifts could be regarded as having been given to the President or the Secretary of Agriculture "for or because of" the official acts of "receiving the sports teams at the White House . . . and speaking to the farmers about USDA policy, respectively." *Id.*

The Court responded that such an absurd result would be "eliminated *through the definition of [official act.]*" 526 U.S. at 408. The Court explained, "[T]he answer to this objection is that those actions — while they are assuredly 'official acts' in some sense — are not 'official acts' within the meaning of the statute . . . ." *Id.* at 407. Bolstering this conclusion, *Sun-Diamond* explained that, when a gratuity is not linked to a specific official act "and the giving of gifts by reason of the

recipient's mere tenure in office constitutes a violation, nothing but the Government's discretion prevents the foregoing example[ ] [of the sports jerseys] from being prosecuted." *Id.* at 408. Without a more explicit directive, we are unwilling to translate *Sun-Diamond*'s brief discussion of the "official act" definition into an unqualified exclusion of all settled practices by a public official from the bribery statute's definition of an official act. And we have no authority to nullify *Birdsall*'s time-tested ruling that an official act need not be specifically prescribed by law.

Put simply, we agree with *Sun-Diamond* and *Valdes* that the bribery statute does not encompass every action taken in one's official capacity, and we also agree with *Valdes* that *Birdsall* did not so hold. Although *Birdsall* recognized that every act within the range of official duty comes within the purview of an "official act," the inquiry does not end there, and such an act must yet adhere to the definition confining an official act to a pending "question, matter, cause, suit, proceeding or controversy." § 201(a)(3). We thus part company with Jefferson's broad assertion that *Sun-Diamond* supersedes *Birdsall*.

The trial evidence showed that Jefferson, as a congressman, had long-standing relationships with businesspersons and investors, and it was his practice to request and receive favors, gifts, and beneficial business deals in exchange for his actions in promoting such businesses, both abroad and domestically, and in ensuring the success of specific business ventures. The acts performed by Jefferson in exchange for the various bribe payments included, inter alia:

- Granting requests for assistance to business ventures by corresponding and visiting with foreign officials;

- Attempting to facilitate and promote ventures between foreign governments and the businesses who were paying him and his family;

• Scheduling and conducting meetings with Army officials and representatives, at which he promoted iGate;

• Travelling to Nigeria and Ghana, and meeting with representatives of the Ex-Im Bank to endorse, assist, and promote the iGate scheme; and

• Vouching for Arkel in Nigeria and seeking to secure construction contracts for the Arkel entities.[37]

Importantly, the various individuals and businesses that were paying Jefferson — by delivering money and things of value to enterprises owned by his family members — were doing so *with the specific understanding* that he would assist in their business ventures. Notably, the *Valdes* court qualified its decision, in a manner that is material here, by emphasizing that

> today's decision is in no way at odds with numerous other cases finding liability under § 201. By focusing on those questions, matters, causes, suits, proceedings, and controversies that are decided by the government, our interpretation of the statute easily covers [inter alia] *a congressman's use of his office to secure Navy contracts for a ship repair firm*, as in *United States v. Biaggi*[, 853 F.2d 89, 96-99 (2d Cir. 1988)].

*Valdes*, 475 F.3d at 1325 (emphasis added). To be sure, the

---

[37]Under the evidence, Jefferson's bribery schemes resulted in him and his family receiving, inter alia, at least $449,300 through ANJ; approximately $21,000 though BEP; 30.7 million shares of iGate stock issued to ANJ; 1.5 million shares of W2-IBBS stock issued to Global; and 1.5 million shares of IBBS stock issued to Global.

D.C. Circuit explained that the contested act in *Biaggi* — a decision substantially identical to this case — was "clearly covered by the statute because [it] concern[ed] inappropriate influence on decisions that the government actually makes." *Id.*

6.

Here, after reading the § 201(a)(3) "official act" definition to Jefferson's jury, the trial court instructed that

> [a]n act may be official even if it was not taken pursuant to responsibilities explicitly assigned by law. Rather, official acts include those activities that have been clearly established by settled practice as part [of] a public official's position.

J.A. 5149. This instruction was entirely consistent with the *Birdsall* principle, which has never been overruled or called into question by the Supreme Court. And the instruction did not in any way supplant the statutory definition of what constitutes an official act; it simply explained to the jury that an official act need not be prescribed by statute, but rather may include acts that a congressman customarily performs, even if the act falls outside the formal legislative process.

Inasmuch as the trial court gave its "settled practice" instruction in tandem with the statutory definition of "official act," the jury was not authorized to ignore the directive that Jefferson's official acts must pertain to a pending question, matter, or cause that was before him. In other words, the jury could not rely exclusively on Jefferson's settled practices.

Finally, it is notable that the prosecution tried Jefferson's case under both "settled practice" and "pending question" theories. For example, the government presented expert testimony on the nature of congressional duties, utilizing the experience and knowledge of former multi-term Representa-

tive Matthew F. McHugh.  Former congressman  McHugh confirmed  that  Jefferson's  obligations  as  a congressman included constituent services, which "involves people who live in your own congressional district coming to you or to your staff, asking for assistance on matters which relate to the Federal Government." J.A. 3825. McHugh also testified that the duties of a congressman include addressing various concerns that relate to committee assignments, and that such actions are performed in a congressman's official capacity pursuant to the settled practices and customs of Congress. The government presented additional evidence that Jefferson was largely responsible for promoting trade in Africa and reaching out to African government officials to foster commercial relationships between those countries and the United States. Thus, the jury was free to find, first of all, that performing constituent services was a settled official practice of Jefferson's congressional office and, second, that African trade issues were "matters" or "causes" that were pending before him.[38] The jury was then entitled to conclude that Jefferson's actions in connection with both constituent requests and the promotion of trade in Africa fall under the umbrella of his "official acts."[39]

---

[38]Although Jefferson's primary defense theory at trial and on appeal is that what he did in connection with the multiple bribe payments did not constitute criminal acts under the bribery statute, that was certainly not his view of those actions while the bribery schemes were ongoing. As he advised Mody in 2005, "these damn notes we're writing to each other, as if we thought . . . [the] FBI's watching us." J.A. 2321. More damning, his criminal mindset was established beyond peradventure by his statement to Jackson that same year that "We've got to do this shit right, though. I mean, otherwise, we're going to all be in the goddamn pokey somewhere, fooling with . . . shit like this." J.A. 783-84. Finally, the jury was entitled to conclude — as it did — that the concealment of $90,000 of a cash bribe provided further confirmation of Jefferson's view that he was involved in criminal activity.

[39]Though we discern no error in the official act instruction, it bears noting that, even if the "settled practice" instruction was erroneously given, it was harmless because the prosecution presented ample evidence to the jury that Jefferson's acts related to the bribe payments were acts on "matters" or "causes" that were pending before him — such as acts in furtherance of his congressional duties to promote trade with Africa.

Viewed in context, the "settled practice" instruction did not impermissibly expand the term "official act." *See Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973) (recognizing proposition that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"). Therefore, we reject Jefferson's contention that the trial court improperly instructed the jury on the definition of an official act.

B.

Jefferson next contends, with respect to the bribery charges in Counts 3 and 4, that the district court erred when it instructed the jury that the prosecution was obliged to prove that, in exchange for bribe payments, Jefferson performed unidentified official acts "on an as-needed basis." Again, we review de novo the claim that a jury instruction failed to correctly state the applicable law. *See El-Shamari*, 217 F.3d at 235. The instruction at the center of this challenge relates to the "quid pro quo" element of the bribery offense, and the court advised the jury that

> the quid pro quo requirement is satisfied if you find that the government has established beyond a reasonable doubt that the defendant agreed to accept things of value in exchange for performing official acts on an as-needed basis, so that [when]ever the opportunity presented itself, he would take specific action on the payor's behalf.

J.A. 5151. Again relying primarily on the *Sun-Diamond* decision, Jefferson asserts that this instruction contravenes the bribery statute's requirement that there be "a specific intent to give or receive something of value *in exchange* for an official act." Br. of Appellant 43 (citing *Sun-Diamond*, 526 U.S. at 404-05). Although we have already discussed the Court's *Birdsall* decision (which arose in the bribery context), as well as its *Sun-Diamond* opinion (in an illegal gratuity case), we

again emphasize the material distinction between a bribery offense and an illegal gratuity offense.

Although both the bribery and illegal gratuity statutes relate to giving a thing of value to a public official, or a public official accepting a thing of value, the illegal gratuity statute, on its face, is one-sided. That is, an illegal gratuity does not require an intent to influence or be influenced. The gratuity is a reward for an action that a public official has already taken, or for an action that the public official has committed to take in the future. The bribery statute, however, requires proof of a quid pro quo, that is, an intent on the part of the public official to perform acts on his payor's behalf. In other words, the public official's intent to perform acts for the payor — required for a bribery offense — is the exchange, or quid pro quo, missing from the illegal gratuity scenario.

In this situation, Jefferson intended to promote, for example, iGate, Mody, and Arkel, in his official capacity as a congressman, in exchange for money and things of value paid through his family's businesses. The fact that he promised to promote certain business ventures on an as-needed basis (and then followed through) does not take this case beyond the ambit of the bribery statute. As we held in *United States v. Quinn*, the government need not

> prove "that the defendant intended for his payments to be tied to specific official acts (or omissions) . . . . Rather, it is sufficient to show that the payor intended for each payment to induce the official to adopt a specific course of action." . . . In other words, "[t]he quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor."

359 F.3d 666, 673 (4th Cir. 2004) (quoting *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998)). Here, the

congressman was soliciting ongoing bribe payments — from iGate, NDTV, Mody, Arkel, and others — to his family's businesses, in exchange for promoting and facilitating lucrative deals between, for example, iGate and the Army, or between iGate, Mody, or Arkel and various African governments. In that context, it would be impossible — and it is unnecessary — to link every dollar paid to one of the Jefferson family companies to a specific meeting, letter, trip, or other action by Jefferson to fulfill his end of a corrupt bargain. We have not and do not read the bribery statute or *Sun-Diamond* to compel any such link.

The trial court's quid pro quo instruction is strongly supported by the Second Circuit's decision in *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007). We agree with that court's explanation that, "in order to establish the quid pro quo essential to proving bribery, the government need not show that the defendant intended for his payments to be tied to specific official acts (or omissions)." *Id.* at 148 (internal quotation marks omitted). Rather, "bribery can be accomplished through an ongoing course of conduct." *Id.* at 149 (citing *Jennings*, 160 F.3d at 1014); *see also United States v. White*, 665 F.3d 560, 568 (3d Cir. 2012) (explaining that "[t]he bribery theory does not require that each *quid*, or item of value, be linked to a specific *quo*, or official act. Rather, a bribe may come in the form of a stream of benefits" (internal quotation marks omitted)).

There was, in this case, an ongoing course of illicit and repugnant conduct by Jefferson — conduct for which he was compensated considerably by those on whose behalf he was acting. An absurd result would occur if we were to deem Jefferson's illicit actions as outside the purview of the bribery statute, simply because he was rewarded by periodic payments to his family's businesses. Given the choice between a "meat axe or a scalpel" when interpreting a statute, we, like the Supreme Court, favor the scalpel. *See Sun-Diamond*, 526 U.S. at 412. We will not, however, carve from the bribery

statute a criterion that depends on the public official's preferred method of payment.

## C.

In his third appellate contention, Jefferson maintains that his honest services wire fraud convictions must be vacated because of an erroneous jury instruction on the self-dealing theory of honest services wire fraud that was repudiated by the Supreme Court in *Skilling v. United States*, 130 S. Ct. 2896 (2010).[40] In response, the government concedes that an instructional error occurred, but maintains that the error was harmless beyond a reasonable doubt. Jury instructions are reviewed holistically for abuse of discretion on claims of adequacy, but, as explained above, Jefferson's contention that the instruction failed to correctly state the applicable law is reviewed de novo. *See United States v. Jeffers*, 570 F.3d 557, 566 (4th Cir. 2009); *El-Shamari*, 217 F.3d at 235. Where the jury has been instructed on two theories of guilt, and one of those theories is erroneous, we further apply a harmless error standard of review. *See Hedgpeth v. Pulido*, 555 U.S. 57, 60–61 (2008) (per curiam); *United States v. Hornsby*, 666 F.3d 296, 305 (4th Cir. 2012).

## 1.

Importantly, the honest services wire fraud allegations rested on alternative theories: (1) that Jefferson solicited bribes in exchange for his official acts in the iGate scheme; and (2) that Jefferson had failed to disclose his conflicts of interest and self-dealing in the iGate scheme. On appeal, Jefferson initially maintains that the first alternative theory is fatally defective because it relied on the erroneous "official

---

[40]Jefferson's contention on the *Skilling* decision is that the erroneous instructions fatally infect six of his convictions, that is, his conspiracy convictions under Counts 1 and 2, his honest services wire fraud convictions under Counts 6, 7, and 10, and his Count 16 RICO conviction.

act" bribery instruction — a contention we today reject. *See supra* Part IV.A. Jefferson then contends that the government's reliance on the second alternative — his undisclosed conflicts of interest and self-dealing in the iGate scheme — is foreclosed by the Court's decision in *Skilling*.

The *Skilling* decision limited the scope of the honest services wire fraud statute, found in 18 U.S.C. § 1346, by confining its application to bribes and kickbacks only.[41] The Supreme Court thereby declined to construe the scope of § 1346 to include "undisclosed self-dealing by a public official or private employee — i.e., the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Skilling*, 130 S. Ct. at 2932.

Inasmuch as Jefferson's convictions rest on multiple theories of guilt, only one of which is flawed, we must assess whether the honest services wire fraud instruction given to the jury in Jefferson's trial was "harmless beyond a reasonable doubt, such that it is clear that a rational fact finder would have found [the defendant] guilty absent the error." *United States v. Poole*, 640 F.3d 114, 120 (4th Cir. 2011). As explained below, we are satisfied that the error was necessarily harmless.

2.

Counts 1 and 2 each charged a conspiracy with multiple objects, in violation of 18 U.S.C. § 371, and the jury was instructed that it only had to find that Jefferson had conspired to commit one of the substantive offenses identified. Count 1

---

[41]Section 1346 of Title 18, which was enacted in 1988, responded to the Supreme Court's 1987 decision in *McNally v. United States*, 483 U.S. 350. Section 1346 specifies that a "'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

charged Jefferson with conspiring to commit bribery, to commit honest services wire fraud, and to violate the Foreign Corrupt Practices Act, and Count 2 charged him with conspiring to commit bribery and honest services wire fraud. Counts 6, 7, and 10 charged Jefferson with honest services wire fraud, in contravention of 18 U.S.C. §§ 1343 and 1346, under the alternative theories identified above. Finally, in the 18 U.S.C. § 1962(c) RICO charge of Count 16, eleven of the twelve racketeering acts specified in the indictment fell under two alternative theories: bribery and honest services wire fraud. The trial court properly instructed the jury that, in order to convict on Count 16, it had to find that Jefferson had committed two or more of those racketeering acts.

Jefferson therefore relies on the *Skilling* decision as a basis for reversal of his convictions on the conspiracy, honest services wire fraud, and RICO offenses.[42] In *Skilling*, however, the Supreme Court simply limited the ambit of § 1346 to those fraud schemes involving bribes or kickbacks, excluding undisclosed conflicts of interest and self-dealing. *See* 130 S. Ct. at 2931 (explaining that "we now hold that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law"). Importantly, the trial court properly instructed the jury on both of the alternative honest services wire fraud theories alleged in the indictment: bribery and self-dealing. And, only one of those theories is erroneous.

Pursuant to the Supreme Court's decision in *Yates v. United States*, when a general verdict on a single criminal charge rests on alternative theories, one valid and the other invalid, the verdict must be set aside if it is "impossible to tell which ground the jury selected." 354 U.S. 298, 312 (1957); *see also United States v. Ellyson*, 326 F.3d 522, 531 (4th Cir. 2003).

---

[42]Jefferson does not claim any spillover prejudice by contending that the *Skilling* error on the conspiracy, honest services wire fraud, or RICO counts tainted his separate convictions for money laundering and bribery offenses.

Jefferson asserts that, under *Yates*, a new trial on the conspiracy, honest services wire fraud, and RICO counts is mandated, because "there is no doubt that the jury could easily have taken the legally invalid path to conviction (i.e., self-dealing honest services wire fraud)." Br. of Appellant 49-50. Unfortunately for Jefferson, however, that is not the applicable standard for our evaluation of the *Skilling* error. Rather, as the Court recognized in *Hedgepeth v. Pulido*, a *Yates* alternative-theory error is subject to ordinary harmlessness review, and the relevant appellate inquiry is whether the error was harmless beyond a reasonable doubt. *See Hedgpeth*, 555 U.S. at 61; *see also Skilling*, 130 S. Ct. at 2934 & n.46 (recognizing that harmless error analysis applies to alternative-theory error cases on direct appeal); *Black v. United States*, 130 S. Ct. 2963, 2970 (2010) (same). Accordingly, a reviewing court is not entitled to reverse a conviction that could rest on either a valid or invalid legal theory if the court can conclude "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999). Put another way, the *Yates* error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 15 (internal quotation marks omitted). By way of example, if the evidence that the jury "necessarily credited in order to convict the defendant under the instructions given . . . is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed." *United States v. Hastings*, 134 F.3d 235, 242 (4th Cir. 1998).

In several recent decisions, the federal courts have applied the harmless error test to uphold convictions that were challenged under *Skilling*. In *United States v. Black*, for example, the Seventh Circuit affirmed fraud convictions where the jury had been instructed on a valid pecuniary fraud theory as well as an invalid "intangible right of honest services" fraud theory. *See* 625 F.3d 386, 388 (7th Cir. 2010). Relying on

*Hedgepeth*, the *Black* court explained that, "if it is not open to reasonable doubt that a reasonable jury would have convicted [defendants] of pecuniary fraud, the convictions on the fraud counts will stand." *Id.* After closely examining the underlying facts, the court affirmed, finding that "[n]o reasonable jury could have acquitted the defendants of pecuniary fraud on this count but convicted them of honest-services fraud." *Id.* at 393. In so ruling, the Seventh Circuit also relied on the fact that the evidence and closing arguments had focused on the pecuniary fraud theory. *Id.*

Similarly, in *Ryan v. United States*, an Illinois district court upheld several convictions, including racketeering and mail fraud, in the face of a *Skilling* challenge, finding that the facts underlying the invalid conflict-of-interest honest services wire fraud theory would nevertheless have supported convictions under a bribery honest services wire fraud theory. *See* 759 F. Supp. 2d 975, 991-93 (N.D. Ill. 2010); *see also United States v. Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011) (affirming honest services wire fraud conviction where jury was instructed on both bribery and self-dealing theories, and conviction of substantive bribery offense "confirm[ed] beyond any reasonable doubt that the jury would have convicted [defendant] of honest services fraud if the court's definition had been limited to the bribery basis that *Skilling* expressly approved"); *United States v. Cantrell*, 617 F.3d 919, 921 (7th Cir. 2010) (ruling that *Skilling* did not disturb honest services wire fraud conviction that rested on kickback scheme). *But see United States v. Wright*, 665 F.3d 560, 570-72 (3d Cir. 2012) (vacating honest services wire fraud conviction where verdict encompassed both bribery theory and defective conflict-of-interest theory).

### 3.

Turning specifically to this case, the jury's guilty verdict on Counts 3 and 4 — the two substantive bribery offenses — demonstrates beyond a reasonable doubt that Jefferson was guilty under the valid bribery theory underlying Counts 1, 6,

7, 10, and 16, and that the *Skilling* error in the jury instructions was necessarily harmless. *See Neder*, 527 U.S. at 15, 18. By convicting Jefferson of those bribery offenses (Counts 3 and 4), the jury necessarily found that Jefferson had committed the bribery object of the Count 1 conspiracy charge, since — as described in both the indictment and the instructions — the bribery object was co-extensive with the bribery conduct charged in Counts 3 and 4.

The foregoing analysis also applies to the Count 16 RICO conviction, in that two of the racketeering acts that the jury found proven were identical to the bribery acts underlying Counts 3 and 4. In this regard, the jury was provided with a verdict form that required it to specify the alleged racketeering acts it found Jefferson had committed. The jury was also provided with Court Exhibit 5, which identified the twelve alleged racketeering acts, eleven of which identified the two alternative theories of liability: bribery of a public official (prong "a") and deprivation of honest services by wire fraud (prong "b"). Two of the racketeering acts that the verdict found as proven were identical to the bribery offenses in Counts 3 and 4. Finally, racketeering act 12, which the jury also found as proven, described monetary transactions in nine separate racketeering acts, including three that corresponded to the money laundering counts (Counts 12-14) on which Jefferson was also convicted. Notably, the verdict on racketeering act 12 is not challenged on appeal.

Nor does *Skilling* provide Jefferson with any basis for relief as to Counts 6, 7, and 10, the honest services wire fraud counts. Although the trial court, on those counts, instructed the jury on both the bribery theory and the erroneous self-dealing theory, Jefferson's convictions on Counts 3 and 4 render the *Skilling* error harmless beyond a reasonable doubt, because, in finding Jefferson guilty of the substantive bribery violations, the jury necessarily found facts that would have supported his convictions under the bribery honest services theory of Counts 6, 7, and 10. Those charges allege wire com-

munications in furtherance of the iGate scheme, the very bribery scheme outlined in Counts 3 and 4 as well as Count 1 — where Jefferson solicited and received bribes from Jackson, Mody, and iGate. Put another way, the bribery theory underlying the honest services wire fraud counts was that Jefferson had deprived American citizens and the House of Representatives of his honest services by soliciting bribe payments from Jackson, Mody, and iGate — conduct the jury found he had committed when it convicted him on Counts 3 and 4.

4.

We turn finally to Count 2, which charges a § 371 conspiracy offense with two statutory objects: bribery and honest services wire fraud. Although the bribery schemes alleged as objects in Count 2 were not charged as substantive bribery offenses, the record establishes beyond a reasonable doubt that the alternative-theory error resulting from the inclusion of the self-dealing wire fraud instruction "did not contribute to the verdict obtained." *See Neder*, 527 U.S. at 15 (internal quotation marks omitted). First, the primary focus of the prosecution's evidence and argument — overall and with respect to Count 2 specifically — concerned the conspiracy's bribery object, not self-dealing honest services wire fraud. And the evidence presented in support of Jefferson's systemic bribery schemes was overwhelming. Second, any reasonable jury that found Jefferson guilty of self-dealing honest services wire fraud would also have found that he conspired to commit either bribery or bribery-related honest services wire fraud.

The prosecution's evidence on Count 2 conclusively established that Jefferson and his brother Mose entered into a bribery scheme whereby Jefferson would solicit bribes from various business persons and entities in exchange for his official acts on behalf of such persons and entities, including, inter alia, George Knost and Arkel; John Melton and TDC; and James Creaghan and Noreen Wilson. On the evidence, we are readily satisfied, beyond a reasonable doubt, that the

guilty verdict on the Count 2 conspiracy rests on a finding that Jefferson conspired with others to commit the bribery object of the conspiracy, as well as the bribery component of honest services wire fraud.

At its core, this prosecution was about bribery. In denying Jefferson's motion to dismiss the honest services wire fraud charges, the district court observed that "the honest services fraud allegations contained in Counts 5-10, and referenced in Counts 1, 2, and 16, explicitly frame the alleged deprivation of honest services as a consequence of defendant's alleged solicitation and receipt of bribes." *United States v. Jefferson*, No. 1:07-cr-00209, slip op. at 7 (E.D. Va. July 8, 2008). Furthermore, the primary thrust of the prosecution's evidence, as well as its jury arguments, concerned Jefferson's involvement in bribery schemes.

In sum, the prosecution's evidence on Count 2 readily proved the conspiracy between Jefferson, his brother Mose, and others, in which Jefferson would perform official acts to benefit bribe payors in exchange for their payments to entities controlled by Mose. Moreover, Jefferson's self-dealing was primarily used as a means to conceal the multiple bribe payments. Even if the jury believed that Jefferson had engaged in a conspiracy to conceal his self-dealing on behalf of the entities and persons involved in the Count 2 conspiracy, it necessarily found that he had conspired to commit bribery and bribery honest services wire fraud, because those alternative theories of liability were co-extensive.

As the prosecution emphasized in its trial argument, the "interests" that Jefferson failed to disclose were the bribe payments he had received in exchange for his actions as a congressman.[43] Indeed, there could be no legitimate purpose or valid

---

[43]By way of example, see J.A. 258 ("[Jefferson] concealed [his] bribe payments from public view by funneling those payments, shares of stock, and other beneficial interests through bogus companies nominally owned

explanation for those payments. Central to the prosecution's evidence and argument on Count 2 was the notion that the entities and agreements that Representative Jefferson caused to be created were at the core of his bribery schemes with Mose, and that they were created as vehicles for the bribe payments Jefferson had solicited. In these circumstances, the *Skilling* instructional error on the Count 2 conspiracy offense was harmless, as it is clear that any rational fact finder would have found Jefferson guilty of that offense absent the error.

### D.

Finally, Jefferson contends that there was a lack of venue in the Eastern District of Virginia for Count 10 of the indictment, which alleges an honest services wire fraud offense, in violation of 18 U.S.C. §§ 1343 and 1346. The wire transmission underlying Count 10 is a simple event: a July 6, 2005 telephone call made by Jefferson "in Accra, Ghana, to Vernon Jackson in Louisville, Kentucky, discussing, among other things, the progress of meetings taking place in Ghana and a letter sent by Defendant Jefferson to Nigerian Official A." J.A. 121. That phone call related to the aspect of the iGate scheme in which Mody was also involved. We review de novo the contention that a district court lacked venue over a criminal charge. *United States v. Newsom*, 9 F.3d 337, 338 (4th Cir. 1993).

---

and operated by his family members through companies that were set up for the sole purpose of receiving the bribe payments."); *id.* ("The evidence will show these sham agreements for what they really were: A means to conceal bribes."); *id.* at 4903 ("Again and again, you have seen evidence of the shell companies set up by Congressman Jefferson at his direction, frequently by the taxpayer paid staff, for the sole purpose of hiding the fact that the congressman was trading his official influence for cash payments and percentages and profits."); *id.* at 5083 ("To the casual observer, these agreements looked legitimate. And that, ladies and gentlemen was the entire purpose."); *id.* at 5088 ("No matter what shell company or what agreement or what nominee, the purpose was always the same: covering up bribes, period.").

1.

Article III of the Constitution provides for the venue of a criminal prosecution, directing that trial "shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3.[44] Rule 18 of the Federal Rules of Criminal Procedure mandates that "the government must prosecute an offense in a district where the offense was committed." And, under § 3237(a) of Title 18, "any offense against the United States begun in one district and completed in another or committed in more than one district may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

It is settled that, in a criminal case, venue must be narrowly construed, *see United States v. Johnson*, 323 U.S. 273, 276 (1944), *abrogated by statute on other grounds*, and venue must be proper for each separate count of a multi-count indictment, *see United States v. Ebersole*, 411 F.3d 517, 524 (4th Cir. 2005). Moreover, we have recognized that where — as here — Congress has not specifically provided for venue in the statute defining an offense, venue lies only where the essential conduct elements of the offense took place:

> When a criminal offense does not include a specific venue provision, venue must be determined from the nature of the crime alleged and the location of the act or acts constituting it. This inquiry is twofold. We must initially identify the conduct constituting the offense, because venue on a count is proper only in a district in which an essential conduct element of the offense took place. We must then determine where the criminal conduct was committed.

---

[44]The Sixth Amendment also alludes to venue, specifying that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district *wherein the crime shall have been committed*." U.S. Const. amend. VI (emphasis added).

*Smith*, 452 F.3d at 334-35 (internal quotation marks omitted); *see also Ebersole*, 411 F.3d at 524 (same). The foregoing decisions serve to implement the clear directive of the Supreme Court for resolution of a venue issue — to first ascertain "the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999).

2.

The parties agree that venue for the prosecution of a federal criminal offense is proper only in a district where an "essential conduct element" of the offense took place. The disagreement on Count 10 arises from the application of the foregoing principle to the charged wire fraud offense. Jefferson contends that the use of a wire communication is the offense's sole essential conduct element, and there was thus no venue in the Eastern District of Virginia, because the phone call underlying Count 10 was neither begun nor completed in that district. For its part, the government maintains that the "devisal and participation in a scheme to defraud" is also an essential conduct element of the wire fraud offense, and that the "Count 10 evidence was sufficient to prove venue as it showed [Jefferson] participat[ed] in the fraudulent scheme to deprive citizens of honest services [i.e., the iGate scheme] in the Eastern District of Virginia." Br. of Appellee 38, 95. The district court endorsed the government's position, ruling that venue was appropriate in the district because Jefferson had there performed "acts directly or causally connected to the wire transmission." *Jefferson I*, 562 F. Supp. 2d at 703-04.

In maintaining that venue is proper on Count 10 in the Eastern District of Virginia, the government relies primarily on the Supreme Court's decision in *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999), and the Seventh Circuit's opinion in *United States v. Pearson*, 340 F.3d 459 (7th Cir. 2003), *vacated on other grounds by Hawkins v.*

*United States*, 543 U.S. 1097 (2005). In *Rodriguez-Moreno*, the Supreme Court ruled that venue for a charge of carrying a firearm in relation to a kidnapping, in violation of 18 U.S.C. § 924(c), was proper in New Jersey. Although the underlying kidnapping offense occurred partly in that state, the defendant had used and carried the firearm only in Maryland. The Court explained that "where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." *Rodriguez-Moreno*, 526 U.S. at 281 (internal quotation marks omitted). In *Pearson*, the Seventh Circuit deemed venue to be proper in a wire fraud prosecution in the district where the defendants performed acts manifesting their intent to defraud, but where the wire communication neither originated nor terminated. *Pearson*, 340 F.3d at 466-67. The government thus argues that, because the iGate scheme underlying Count 10 was devised and partially carried out in the Eastern District of Virginia, venue for wire fraud was proper there.

3.

The wire fraud statute provides for the punishment of whoever "transmits or causes to be transmitted" a wire communication to execute a scheme or artifice to defraud. 18 U.S.C. § 1343. The essential elements of a wire fraud offense are "(1) the existence of a scheme to defraud and (2) the use of . . . a wire communication in furtherance of the scheme." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006).[45]

---

[45]The district court instructed the jury in rather more detail, however, directing that it could convict on Count 10 only if it found: (1) that Jefferson knowingly devised or participated in a scheme to defraud; (2) that the scheme to defraud involved a material misrepresentation or concealment of material fact; (3) that Jefferson acted with intent to defraud; and (4) that in carrying out the scheme to defraud, Jefferson transmitted or caused to be transmitted a wire communication. Although the court charged the jury in four elements rather than two, its instruction probably favored Jefferson, and certainly covered the essential aspects of a wire fraud offense. In any event, neither Jefferson nor the government has contested the propri-

The scheme to defraud is clearly an essential element, but not an essential *conduct* element, of wire (or mail) fraud. *See United States v. Ramirez*, 420 F.3d 134, 144-145 (2d Cir. 2005); *see also United States v. Pasquantino*, 336 F.3d 321, 332 n.5 (4th Cir. 2003) (recognizing that, "[b]ecause the mail and wire fraud statutes share the same language in relevant part, we apply the same analysis to both offenses"). Rather, "the essential conduct prohibited by § 1343 [is] the misuse of wires as well as any acts that cause such misuse." *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002); *see also Ebersole*, 411 F.3d at 527 ("Here, the nature of the offense alleged was the act of causing a wire to be transmitted in furtherance of a fraud." (internal quotation marks omitted)); *United States v. Condolon*, 600 F.2d 7, 8 (4th Cir. 1979) ("The gravamen of the [wire fraud] offense is simply the misuse of interstate communication facilities to execute 'any scheme or artifice to defraud.'"). Similarly, the essential conduct element in mail fraud is "the misuse of the mails." *See Ramirez*, 420 F.3d at 144 (holding that the essential conduct element of mail fraud "encompasses the overt act of putting a letter into the postoffice" (internal quotation marks omitted)).

In a mail or wire fraud prosecution, the mailing or wire transmission itself — i.e., misuse of the mail or wire — has consistently been viewed as the *actus reus* that is punishable by federal law.[46] In such prosecutions, it is settled that each

_____

ety of the wire fraud instruction. *See United States v. Hornsey*, 666 F.3d 296, 310 (4th Cir. 2012) (reciting circuit precedent that no error committed where, "taken as a whole, the instruction fairly states the controlling law" (citation omitted)).

[46]The *actus reus* is the "guilty act" required for the imposition of criminal sanctions, and is distinguishable from the *mens rea*, i.e., the guilty mind. *See United States v. Muzii*, 676 F.2d 919, 920, 923 (2d Cir. 1982) (recognizing that the "guilty act . . . must be contemporaneous with the guilty mind" and "an attempt to punish evil thoughts alone would cast the net of the criminal law too widely").

mailing or wire transmission in furtherance of the fraud scheme constitutes a separate offense, and it may be separately punished. *See Badders v. United States*, 240 U.S. 391, 394 (1916) (recognizing that "there is no doubt that the law may make each putting of a letter into the postoffice a separate offence" when multiple mailings relate to the same scheme); *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008) (determining that, "[w]here one scheme or artifice to defraud involves multiple wire transmissions, each wire transmission may form the basis for a separate count" because "Section 1343 targets not the defendant's creation of a scheme to defraud, but the defendant's *execution* of a scheme to defraud"); *United States v. Allen*, 491 F.3d 178, 181-84 (4th Cir. 2007) (affirming convictions on multiple counts of wire fraud arising from single scheme).

The treatment of multiple transmissions as separate offenses is linked inexorably to the legal principles applicable to issues of double jeopardy. As the Supreme Court explained long ago, in *Blockburger v. United States*, the separate punishment test implicates the question of "whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately . . . . If the latter, there can be but one penalty." 284 U.S. 299, 302 (1932) (internal quotation marks omitted). As the Eighth Circuit recognized in *United States v. Gardner*, an indictment that charges multiple mail fraud offenses based on a single fraud scheme does not contravene the Double Jeopardy Clause under *Blockburger*, because "it is not the plan or scheme that is punished." 65 F.3d 82, 85 (8th Cir. 1995). The *Gardner* court emphasized that the criminal acts being punished are, as here, each separate mailing (or wire transmission). *Id.*; *see also Badders*, 240 U.S. at 394.

Applying these principles, the multiple wire fraud charges in Jefferson's indictment do not pose a double jeopardy issue — and none is raised — because § 1343 criminalizes each wire transmission in furtherance of a single fraud scheme. It

is the physical act of transmitting the wire communication for the purpose of executing the fraud scheme that creates a punishable offense, not merely "the existence of a scheme to defraud." As the Second Circuit explained in *Ramirez*, a conduct element is one of action, such as the act of putting a letter in the mailbox or making a telephone call. *See* 420 F.3d at 144-45. On the other hand, the element of devisal of the scheme "connotes contemplation, not action." *Id.* at 144.

The government's argument for venue on the basis of Jefferson's "devisal and participation in a scheme to defraud," if accepted, would constrict the application of the wire fraud statute, which requires only that the subject scheme be devised, not that it be participated in. As the *Ramirez* court pointed out with respect to the identical element of the analogous mail fraud statute, "devising a scheme to defraud [ ] is not itself conduct at all (although it may be made manifest by conduct), but is simply a plan, intention or state of mind, insufficient in itself to give rise to any kind of criminal sanctions." 420 F.3d at 145. Requiring an additional showing of participation in the scheme impermissibly engrafts a conduct component onto a pure intent element, confusing the issue before us. The district court therefore erred in relying on Jefferson's "acts directly or causally connected to the wire transmission" as providing venue, because aside from the transmission itself, there are no acts necessary to establish the crime of wire fraud.

That the devisal of a scheme relates only to establishing the *mens rea* element of the wire fraud offense provides a critical distinction between Jefferson's situation and the one addressed by the Court in *Rodriguez-Moreno*. In the latter case, both of the essential elements — using or carrying a firearm and committing a crime of violence — were conduct elements requiring physical acts. It was therefore of no moment that the defendant, prosecuted in one state where he engaged in the predicate kidnapping, used or carried a firearm only in another state, after he took the victim there:

Since one of the essential conduct elements of the
offense had occurred in New Jersey, venue was
proper there . . . even though the other essential con-
duct element had occurred elsewhere. The govern-
ment would have us conclude that "having devised
or intending to devise a scheme or artifice to
defraud" . . . is comparable to "during a crime of vio-
lence" under § 924(c)(1). But whereas a crime of
violence such as kidnaping is an act, and thus may
qualify as an essential *conduct* element, . . . "having
devised or intending to devise a scheme or artifice to
defraud" is not.

*Ramirez*, 420 F.3d at 146 (citation omitted).

The government's position on venue ignores that the crime
charged in Count 10 was not the bribery scheme, but the
offense of wire fraud occasioned by a single telephone call.
Its distinct parts — the making and completion — occurred
in two different localities, neither of which was within the
Eastern District of Virginia.[47]

---

[47]The government's argument for venue on Count 10 would invite the
dismissal of the indictment's wire fraud charges for multiplicity — a con-
stitutional doctrine implicating both the Double Jeopardy Clause and Fifth
Amendment due process. *See United States v. Colton*, 231 F.3d 890, 909-
10 (4th Cir. 2000) (deeming bank fraud charges to be multiplicious);
*United States v. Mancuso*, 42 F.3d 836, 847 n.11 (4th Cir. 1994) (explain-
ing that "[m]ultiplicity is charging a single offense in more than one count
in an indictment" (internal quotation marks omitted)). If, as the govern-
ment contends on appeal, Jefferson's scheme to defraud was itself an
essential conduct element, and thus sufficient to establish venue for a wire
fraud charge in every district touched by the scheme, the Jefferson indict-
ment could be deemed multiplicious. That is, if the crime of wire fraud
were defined by the single underlying scheme and not by the individual
acts of wire transmission, the indictment could be said to charge the same
offense in each of Counts 6 though 10.

4.

In determining that venue was proper on Count 10, the district court relied on the Seventh Circuit's *Pearson* decision, which concluded that, under the wire fraud statute, venue is proper in any district where the defendant's acts "provided critical evidence of the 'intent to defraud,' an element of the crime of wire fraud." 340 F.3d at 466; *see Jefferson I*, 562 F. Supp. 2d at 702-04. That position runs contrary to the decisions of at least two of our sister circuits. *See Ramirez*, 420 F.3d at 144 (mail fraud; rejecting government's argument that "venue is proper . . . in any district where any aspect of the scheme or artifice to defraud was practiced"); *Pace*, 314 F.3d at 349 (wire fraud; "Although a fraudulent scheme may be an element of the crime of wire fraud, it is using wires and causing wires to be used in furtherance of the fraudulent scheme that constitutes the prohibited conduct. Therefore, venue is established in those locations where the wire transmission at issue originated . . . or was received . . . ." (internal quotation marks omitted)).[48] In sum, we agree with the Second and Ninth Circuits, and we are satisfied to adhere to the venue principles enunciated and applied in their *Ramirez* and *Pace* decisions.

---

[48]The district court incorrectly perceived that the Seventh Circuit's *Pearson* decision could somehow be reconciled with the *Pace* and *Ramirez* principles. *See Jefferson I*, 562 F. Supp. 2d at 703-04. Notably, the *Pearson* court itself did not think so. *See Pearson*, 340 F.3d at 467 n.3 ("declin[ing] to adopt the analysis" in *Pace*). Nor does the government so believe, as it argues that *Pace* and *Ramirez* were wrongly decided. *See* Br. of Appellee 97 n.34 ("[T]he narrow view of venue espoused in [*Pace* and *Ramirez*] is contrary to *Rodriguez-Moreno*."). Contrary to the government's position, however, neither *Pace* nor *Ramirez* is in any way adverse to *Rodriguez-Moreno*. To adopt the government's venue theory, we would be called upon to approve a type of "pendent venue" for wire fraud offenses, or otherwise agree that a "substantial contacts" test could be applied. Because both those propositions run counter to the Constitution and Rule 18, we are unwilling to adopt either of them.

Representative Jefferson could have been — and perhaps yet could be — prosecuted on Count 10 in the district in Kentucky where his phone call was received. If the call had originated domestically (rather than in Africa), he might also have been prosecuted in the district from which the phone call had been made. *See Ebersole*, 411 F.3d at 527 (explaining that wire fraud is continuing offense under § 3237(a) and thus may be prosecuted in any district where offense was begun, continued, or completed). But Jefferson could not, on these facts, be properly prosecuted on Count 10 in the Eastern District of Virginia. As a result, we are obliged to vacate Jefferson's conviction and sentence on that charge.

## IV.

Pursuant to the foregoing, we affirm each of Jefferson's convictions in this case except his Count 10 wire fraud conviction and sentence, which we vacate and remand for such further proceedings as may be appropriate.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*