**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4118**

UNITED STATES OF AMERICA,

     Plaintiff – Appellee,

   v.

SARGIS TADEVOSYAN,

     Defendant – Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  John T. Copenhaver, Jr., District Judge.  (2:11-cr-00142-1)

Argued:  February 1, 2013      Decided:  May 2, 2013

Before NIEMEYER, DUNCAN, and DIAZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** A. Courtenay Craig, CRAIG LAW OFFICE, Huntington, West Virginia; Tony Mirvis, THE MIRVIS LAW FIRM, P.C., Brooklyn, New York, for Appellant.  Meredith George Thomas, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** R. Booth Goodwin II, United States Attorney, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Sargis Tadevosyan ("Appellant") was convicted of one count of conspiracy to commit healthcare fraud and wire fraud under 18 U.S.C. § 1349 and one count of aiding and abetting aggravated identity theft under 18 U.S.C. §§ 1028A and 2(a). The district court denied Appellant's pretrial motion to suppress photographs that were seized despite being outside the scope of a search warrant. The district court also denied Appellant's motion for a minimal role reduction and sentenced him to forty-eight months' imprisonment as to count one and twenty-four months' imprisonment as to count two, to run consecutively.

Appellant raises five issues on appeal. First, he challenges the sufficiency of the evidence on the merits. Second, he contends that the district court erred when instructing the jury as to the "specific intent" element of the conspiracy offense. Third, he argues that the district court incorrectly denied his motion to suppress the seized photographs. Fourth, he alleges that the district court erred in not applying the minimal role offense level reduction at sentencing. Finally, he claims that the government violated the

2

<u>Brady</u>[1] doctrine in failing to turn over evidence related to his codefendant. Finding no error, we affirm.

I.

A.

In 2010, codefendants Igor Shevchuk and Arsen Bedzhanyan, both Russian nationals, were living in New York City on student visas.[2] They were approached by a man known as "Garik" and offered $5,000 each to open bank accounts in the names of individuals who had left the country. Shevchuk and Bedzhanyan agreed, and Garik had false identification cards created with their photographs.

In December of 2010, Bedzhanyan and Shevchuk traveled with Garik to West Virginia. Bedzhanyan and Shevchuk used false identification cards and business papers, supplied by Garik, to open a number of bank accounts in and around Charleston, West Virginia. At one bank--the United Bank in Dunbar, West Virginia--Shevchuk used the name Klim Baykov, along with Klim Baykov's Social Security Number, to open an account for KB

---

[1] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

[2] We recite the facts in the light most favorable to the government, as the prevailing party at trial. <u>See</u> <u>United States v. Jefferson</u>, 674 F.3d 332, 341 n.14 (4th Cir. 2012).

3

Support Group, Inc.[3] KB Support was one of six "false-front" healthcare providers[4] in West Virginia linked to the bank accounts opened by Bedzhanyan and Shevchuk. Each of the false-front providers had an office in the Charleston area. Together, these providers submitted more than $4 million in fraudulent claims to Medicare over the course of the alleged conspiracy, which were paid via wire transfers to the bank accounts.

In the spring of 2011, Garik told Bedzhanyan and Shevchuk that they had to return to West Virginia to fix a problem with the wire transfer capability of the United Bank account. Garik informed Bedzhanyan that he would be unable to travel with them, and instead Garik's friend would transport them.

Garik's friend turned out to be Appellant. He picked up Bedzhanyan and Shevchuk sometime in the evening on May 5, or early on May 6, 2011, for the drive from New York to West Virginia. Appellant brought with him the United Bank card as well as the false identification card that Bedzhanyan and Shevchuk had previously used to open the United Bank account. Bedzhanyan testified at trial that when they got into the car,

---

[3] This act formed part of the basis for Appellant's conviction of aiding and abetting aggravated identity theft.

[4] False-front providers are business entities created to bill Medicare for healthcare services that are never actually rendered.

Appellant "made sure we kn[e]w about what we're going there for and everything had been explained to us," and knew that Bedzhanyan and Shevchuk were going to the bank to sign paperwork. J.A. 776.

As they drove through Maryland, a state trooper stopped Appellant for speeding. Before the trooper approached the car, Appellant handed Bedzhanyan the false identification card and the bank card and told him to hide them by pushing them into the gap between the window and the car door. Because Appellant spoke limited English, he instructed Bedzhanyan to tell the trooper that the men were traveling to West Virginia to buy a car.

Once in Dunbar, Appellant had difficulty retrieving the cards from the door frame. Eventually, using a set of tools purchased from a car supply store, he was able to recover them. While Appellant worked, his cell phone rang continuously; Garik was attempting to reach Appellant because Bedzhanyan and Shevchuk were late for their meeting at the bank. Garik then called Shevchuk and told him to give Appellant the phone. As Appellant spoke with Garik, Bedzhanyan and Shevchuk observed him looking at a set of keys.

Appellant then drove Bedzhanyan and Shevchuk to the bank and gave Bedzhanyan the cards and a cell phone, instructing the pair to meet him at a nearby McDonald's restaurant when they

5

were finished. After completing their business at the bank, Bedzhanyan and Shevchuk walked to McDonald's, where Appellant picked them up and told them that he needed to make a few stops, including a stop to pick up mail. Appellant first stopped at a car dealership, where law enforcement agents, who had been monitoring Appellant's movements, arrested all three men.

Law enforcement agents obtained search warrants for seven locations, including the six false-front offices in West Virginia, and the car Appellant had been driving. The agents had previously spotted a car owned by Ara Ohanyan at one of the false fronts and had obtained a copy of Ohanyan's driver's license photograph. The agents had also reviewed a surveillance tape depicting an unnamed individual who rented one of the false-front offices.

When they searched Appellant's car, agents found nine folders in the pocket behind the driver's seat. The folders contained photographs, including pictures of Appellant with Ohanyan and the unnamed individual. In the driver's side door, agents found a set of keys labeled with the false front addresses. When the agents searched the false fronts, they found mail littering the floor and desks of the offices.

B.

After being charged in a two-count indictment, Appellant moved to suppress the photographs recovered from the car. The

6

district court denied the motion as to all photographs depicting Appellant with Ohanyan or the unnamed individual, concluding that although the photographs were outside the scope of the warrant, they were properly seized because they were in "plain view."

During the charge conference, Appellant objected to the district court's jury instruction regarding specific intent, arguing that it "treats it all as a general conspiracy instead of [a] conspiracy to commit a violation of the health care statute or the wire fraud statute." J.A. 619. The district court overruled the objection. After deliberations, the jury found Appellant guilty of both counts. Appellant filed written motions for a judgment of acquittal and for a new trial, both of which the district court denied.

Prior to sentencing, counsel for Appellant informed the government that he had evidence suggesting that codefendant Shevchuk[5] had an alternate identity under the name "Idlar Adjuglov." The government then reviewed its files and found (1) Shevchuk's visa application that included the e-mail address adjigul@mail.ru, (2) an alternate spelling of "Adjuglov" listed as Shevchuk's mother's maiden name on the same application, and

---

[5] Shevchuk and Bedzhanyan testified against Appellant at trial.

7

(3) summary translations of Shevchuk's jailhouse phone calls in which the translator noted that Shevchuk was called "Eldar."

At sentencing, Appellant argued that this information should have been provided to the defense under Brady. Appellant informed the district court that he intended to move for a new trial. The government responded that both a copy of the visa application and the written translations of Shevchuk's phone calls had been provided to Appellant during pre-trial discovery. The district court directed Appellant to file a motion for new trial, J.A. 911, which Appellant did not do.

Appellant also asked the court to apply the § 3B1.2(a) Sentencing Guidelines minimal role reduction, arguing that his only involvement in the scheme was to drive two individuals to West Virginia. The court denied Appellant's request and sentenced him to forty-eight months' imprisonment as to count one and twenty-four months' imprisonment as to count two, to run consecutively. This appeal followed.

II.

A.

We first consider whether the district court erred in denying Appellant's motion for judgment of acquittal, an issue we review de novo. United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005). When the motion is based upon a claim of

8

insufficient evidence, the jury's verdict must be sustained "if there is substantial evidence, taking the view most favorable to the government, to support it." United States v. Abu Ali, 528 F.3d 210, 244 (4th Cir. 2008) (internal quotations omitted). In evaluating the sufficiency of the evidence, this court does not reweigh evidence or reassess the factfinder's determination of witness credibility and can "reverse a conviction on insufficiency grounds only when the prosecution's failure is clear." United States v. Moye, 454 F.3d 390, 394 (4th Cir. 2006) (internal quotations omitted).

Regarding the conspiracy charge, Appellant argues that the government failed to offer any witness to demonstrate that he was aware that the objects of the conspiracy were healthcare and wire fraud, and therefore failed to prove the requisite mens rea. As to the charge for aiding and abetting aggravated identity theft, Appellant contends that the government failed to show that "Klim Baykov" was an actual person and that Appellant knew that he was an actual person, both of which are required for a conviction.

The government responds that there was substantial evidence that Appellant agreed to be a part of the conspiracy and understood the nature of the scheme, and also argues that it presented sufficient evidence to demonstrate that Klim Baykov was a real person. In response to Appellant's contention that

9

it failed to present evidence to show that Appellant knew that Klim Baykov was a real person, the government submits that Appellant did not make this argument before the district court, and therefore waived it on appeal.

To convict Appellant of conspiracy to commit healthcare or wire fraud, the government had to prove that: (1) two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan to commit healthcare or wire fraud, and (2) Appellant willfully became a member of that conspiracy. See United States v. Fleschner, 98 F.3d 155, 159 (4th Cir. 1996). Although Appellant argues that the government proved only that he innocently drove his codefendants to West Virginia, the record demonstrates that he did much more.

To begin with, Appellant sought assurances from Bedzhanyan and Shevchuk that they understood why they were traveling to West Virginia, namely to facilitate same-day wire transfers out of the United Bank account. Appellant also had with him the false identification card and the bank card that Bedzhanyan and Shevchuk had not seen since they were in Garik's possession, which the pair then used during their meeting with the bank. When stopped by a Maryland state trooper, Appellant instructed Bedzhanyan to hide the cards and to lie about the purpose of their trip to West Virginia. Law enforcement officers found

10

keys to the false-front offices in the driver's door of the car Appellant was driving. Finally, Appellant stated that he needed to pick up mail in West Virginia, and officers found mail littering the false-front offices.

Appellant's focus on the lack of direct evidence regarding his knowledge ignores the ability of the jury to make inferences from other evidence. Both direct and circumstantial evidence may sustain a conviction, United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008), and there was more than sufficient evidence from which the jury could infer Appellant's knowledge about the objects of the conspiracy. Appellant's connection to the fraudulent healthcare providers could be inferred from his possession of the false identification card, the bank card, and the keys to the false fronts. Additionally, a jury could reasonably infer that the mail Appellant intended to pick up before being arrested was the same mail found at the false fronts. Drawing all inferences in favor of the government, we find that substantial evidence supported the jury's verdict as to count one.

We reach a similar conclusion as to the second count alleging that Appellant aided and abetted aggravated identify theft. Specifically, we are satisfied that the victim of the offense, Klim Baykov, was an actual person. Bedzhanyan and Shevchuk testified that Garik told them that they were opening

11

accounts under the names of real people who had left the country. In addition, the United Bank account was successfully opened using Klim Baykov's Social Security Number. Finally, the government presented a certificate from the Social Security Administration indicating that the Social Security Number associated with Klim Baykov on the bank account actually did belong to a person named Klim Baykov. Together, these facts constitute substantial evidence supporting the jury's finding that Klim Baykov was a real person.[6]

B.

We next consider Appellant's argument that the district court erred in its instructions to the jury as to Appellant's specific intent to commit either healthcare fraud or wire fraud. We review de novo a claim that the district court misstated the law in a jury instruction. See United States v. Jefferson, 674 F.3d 332, 351 (4th Cir. 2012). "[W]e do not view a single instruction in isolation; rather we consider whether, taken as a whole and in the context of the entire charge, the instructions

---

[6] Appellant also contends that the government failed to show that he knew Klim Baykov was a real person. Having failed to present that argument to the district court, we decline to consider Appellant's new theory on appeal. See United States v. Chong Lam, 677 F.3d 190, 200 (4th Cir. 2012) ("When a defendant raises specific grounds in a Rule 29 motion, grounds that are not specifically raised are waived on appeal.").

accurately and fairly state the controlling law." United States

v. Rahman, 83 F.3d 89, 92 (4th Cir. 1996).

Appellant argues that the instruction given by the court was too general in that it only required the government to prove that Appellant agreed to commit a criminal act, rather than one of the specific types of fraud charged in the indictment. The government responds that the Appellant focuses too narrowly on the district court's instruction regarding the definition of "specific intent." According to the government, if the court's instructions are read in their entirety, the court correctly stated the government's burden of proof.

The instruction to which Appellant objected reads:

> To establish specific intent, the government must prove beyond a reasonable doubt that the defendant knowingly did an act which the law forbids, purposely intending to violate the law. That is not to say that the defendant must have known he was violating a particular statute, but only that the defendant knew he was acting wrongly and knew he was violating the law in general when he acted.

J.A. 608. Earlier in the jury instructions, the court stated that the government was required to prove beyond a reasonable doubt that

> two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common unlawful plan, that is, to commit health care fraud or to commit wire fraud, as charged in count one; and . . . that [Appellant] willfully became a member of that conspiracy.

13

J.A. 590. The district court recited these elements again later in the instructions. J.A. 614-15. The court also instructed the jury that "[t]o act willfully in a conspiracy means to act voluntarily and intentionally, and with specific intent to do something the law forbids." J.A. 594.

We conclude that the jury instructions, read as a whole, correctly state the law, including the government's burden of proof. The instruction to which Appellant objects defines specific intent, and thus necessarily contains more general language than the separate recitation of the elements of conspiracy to commit wire and healthcare fraud. The district court's instructions as to the elements of the crime, by contrast, are nearly identical to the language that Appellant suggests is correct.

Appellant's related assertion that the government must prove that he knew he was violating a specific statute is based on a case decided by a sister circuit analyzing a completely different statute. See United States v. Brodie, 403 F.3d 123, 147 (3d Cir. 2005) (discussing the Trading with the Enemy Act, which specifically requires that the government prove that the defendant have some knowledge of the underlying law prohibiting trade with Cuba, see 50 App. U.S.C. § 1 et seq.). No such requirement exists for either of the crimes charged in the

14

conspiracy indictment.  See 18 U.S.C. §§ 1349, 1028A, 2.  In sum, we find no error in the district court's instructions.

C.

We next turn to Appellant's assertion that the district court erred in failing to suppress the photographs seized by law enforcement officers from the car Appellant drove to West Virginia.  When considering a district court's denial of a motion to suppress, we review the court's factual findings for clear error and legal conclusions de novo.  United States v. Lewis, 606 F.3d 193, 197 (4th Cir. 2010).  We construe the evidence in the light most favorable to the government, as the prevailing party at trial.  Id.

The district court declined to suppress some of the photographs seized by the agents--specifically those showing Appellant with Ohanyan and the unnamed individual who rented one of the false-front offices--finding that they were in "plain view."  Appellant contends that the photographs should not have been seized because they were not incriminating, citing to an officer's testimony at trial that the photographs were not "criminal."

The plain view doctrine applies in "the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character."  Coolidge v. New Hampshire,

15

403 U.S. 443, 465 (1971). Law enforcement may seize evidence in plain view during a lawful search if "(1) the seizing officer is lawfully present at the place from which the evidence can be plainly viewed; (2) the seizing officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." United States v. Williams, 592 F.3d 511, 521 (4th Cir. 2010) (internal quotations omitted). "The incriminating nature of an object is immediately apparent if, under the circumstances, the officer has probable cause to believe that the item is linked to criminal activity." Russell v. Harms, 397 F.3d 458, 465 (7th Cir. 2005) (internal quotations omitted).

We agree with the district court that the incriminating character of the photographs was immediately apparent based on the officers' knowledge about the other individuals depicted in them and their connections to the fraud scheme. Before conducting the search, law enforcement agents reviewed photographs of Ohanyan, whose car was spotted at one of the false-front offices, and of an unnamed individual, who rented one of the offices. The agents immediately identified these two individuals in the photographs with Appellant. Because the photographs showed Appellant associating with people connected to the false-front providers, the district court correctly determined that the photographs were incriminating, as they

16

tended to link Appellant with the crimes alleged in the indictment.[7]

It is true, as Appellant contends, that a law enforcement agent testified that there was nothing "criminal" about the photographs at issue. J.A. 204. But it is not clear to us what the agent meant by his testimony, nor does it matter. Rather, the relevant question is whether the photos were incriminating, in the sense that the agents had probable cause to believe that they were evidence of criminal activity. See Harms, 397 F.3d at 465. The photographs in question showed Appellant associating with persons known to be linked to the fraud scheme, which is sufficient to show their incriminating character.

D.

We next turn to Appellant's argument that the court erred in refusing to apply the minimal role reduction to his offense level at sentencing. Under § 3B1.2 of the Sentencing Guidelines, a district court must reduce the defendant's offense level if it finds that he played a minimal or minor role in the offense. A defendant is entitled to a four-level adjustment if his or her role was minimal, see U.S.S.G. § 3B1.2(a), and a two-level adjustment if his or her role was minor but not minimal,

---

[7] Because we hold that the photographs were properly seized, we do not reach the government's alternative argument that the good faith exception to the warrant requirement should apply.

17

see id. § 3B1.2(b). The minimal participant reduction applies when the defendant's "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." Id. § 3B1.2 cmt. n. 4.

In determining whether the reduction is appropriate, the "critical inquiry is . . . not just whether the defendant has done fewer 'bad acts' than his co-defendants, but whether the defendant's conduct is material or essential to committing the offense." United States v. Pratt, 239 F.3d 640, 646 (4th Cir. 2001). A defendant seeking a downward adjustment for his or her minimal role in the offense must prove that he or she is entitled to it by a preponderance of the evidence. See United States v. Akinkoye, 185 F.3d 192, 202 (4th Cir. 1999). We review the district court's determination on this issue for clear error. United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir. 1989).

Appellant contends that the totality of the circumstances, including his lack of involvement prior to driving Bedzhanyan and Shevchuk to West Virginia, the fact that he did not discuss the plan with them during the drive, and the fact that Appellant did not himself set up any bank accounts, indicates that he was the least culpable of those involved in the scheme.

18

We have already summarized the facts of record supporting Appellant's convictions. Those same facts we think show clearly that Appellant's participation was both material and essential to committing the offenses. We therefore affirm the district court's decision not to apply the minimal role reduction at sentencing.

E.

Finally, we consider Appellant's contention that the government's failure to provide certain evidence to the defense violated the Brady doctrine. According to Appellant, after being alerted to Shevchuk's possible alternate identity prior to sentencing, the government admitted to finding evidence suggesting that Shevchuk had called himself "Ildar Adjuglov." Appellant argues that an alternate identity is valuable impeachment evidence, and that the government therefore violated its responsibility under Brady by not turning it over in advance of trial.

With few exceptions, the jurisdiction of circuit courts is limited to reviewing appeals from all final decisions of district courts. 28 U.S.C. § 1291. Appellant contends that this requirement is satisfied here because the district court "effectively denied" his oral motion for a new trial. Appellant's Reply Br. at 1.

19

We disagree. The record shows that the court instructed Appellant to file a motion for new trial; nothing resembling a denial of an oral motion occurred. J.A. 911. Appellant, however, never filed a motion, which in turn means that the district court never considered the claim. Accordingly, we lack jurisdiction to review the issue.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED